838 P.2d 1340

**STATE of Arizona, Appellee,**

v.

**Ronald SWANSON, Appellant.**

**No. 1 CA–CR 90–1404.**

Court of Appeals of Arizona, Division 1, Department B.

April 14, 1992.

Review Denied Nov. 3, 1992.*

---

* Martone, J., of the Supreme Court, voted to grant review.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Crim. Div., and Daniel J. Kiley, Asst. Atty. Gen., Phoenix, for appellee.

A. Michael Espino, Navajo County Public Defender by Diana M. Squires, Deputy Public Defender, Holbrook, for appellant.

## OPINION

JACOBSON, Presiding Judge.

Ronald Swanson appeals from his convictions for possession for sale and transportation of cocaine, in violation of A.R.S. § 13–3408(A)(2) and (7), both class 2 felonies. The only issue we need address on appeal is whether the trial court properly denied defendant's motion to suppress evidence obtained as the result of a search of the rental car defendant was driving. We hold that the trial court should have granted the motion to suppress evidence obtained in a search and seizure that exceeded the scope of defendant's consent and was otherwise unsupported by probable cause.

## FACTS AND PROCEDURAL HISTORY

On the morning of November 8, 1989, Department of Public Safety Officers Rush and Hash stopped defendant and his passenger as they were driving eastbound on Interstate 40 near Holbrook. The officers were in their patrol car, facing west, when Rush first spotted defendant's car, which Rush believed was speeding in the passing lane. The officers crossed the median of the interstate, accelerated and followed the car.

Defendant was not speeding when the officers reached his car. However, the officers observed him change lanes without signaling. Officer Hash flashed the emergency lights and immediately pulled defendant over. Hash noticed that defendant's vehicle had California plates and observed a cellular phone, a citizen's band (CB) radio, a radar detector, and several pagers in the car.

Officer Hash asked defendant for his driver's license and the vehicle registration. Defendant produced his driver's license and rental car papers. Defendant then accompanied Hash back to the patrol car, where he remained for five to seven minutes, as Hash explained the reason for the stop and issued a warning.[1] Defendant told Hash that he was going from Los Angeles to New York for a family reunion.

After giving defendant the warning, Officer Hash asked him if he had any guns, large sums of money, or drugs in the car; defendant said no. Hash then asked defendant to read and sign a consent to search form. Officer Rush also handed defendant a copy of a consent form and asked his consent to search the car. Although the officers asked him five or six times, defendant refused to sign the consent form. Defendant did, however, give verbal permission to the officers to "go in and look."

After defendant acquiesced in the search, Hash took out tools and he and

---

1. Officer Hash testified that he does not issue citations for failing to signal intent before changing lanes; instead, his practice is to issue written warnings.

Rush began to search the car. During the search, defendant and his passenger stood with Sergeant Lane, who had also arrived at the scene. Lane testified that defendant and his passenger were calm, open, and friendly during the search. In fact, Lane and defendant's passenger discussed their respective families and showed each other pictures of their children. However, Lane testified that the two men became "nervous" when one of the officers opened the right rear door of the rental car.

During the search, Officer Rush noticed that the screws on the left rear door panel had been tampered with. He testified that they looked "[l]ike someone had taken a screwdriver to them, loosened them up." He informed Hash. Hash, without asking defendant for additional permission, removed the door panel with a tool known as a "slim jim." There he discovered six kilograms of what appeared to be cocaine. Inside the right rear door the officers found six bottles of vitamin super B.[2] The officers then arrested defendant and his passenger. This entire process between initial stop and arrest took approximately 45 minutes.

Before trial, defendant moved to suppress the state's evidence, arguing that the search of the vehicle was unconstitutional. After a hearing, the court denied the motion and defendant and his passenger were tried. The jury found defendant guilty of possession for sale and transportation of a narcotic drug. See A.R.S. § 13-3408(A)(2) and (7). He was sentenced to concurrent aggravated terms of ten years in prison and fined $150,000. Defendant timely appealed.

## DISCUSSION

Contending that his fourth amendment[3] rights were violated by the search and sei-

zure, defendant on appeal, asserts the following arguments in support of suppression:[4]

1. The search was unconstitutional because it grew out of a pretextual stop;

2. He gave no valid consent to the search; and

3. The search exceeded the scope of consent, if any.

### A. Pretext Stop

▮ In reviewing a motion to suppress, this court will consider the facts in the light most favorable to sustaining the trial court's ruling. State v. Acosta, 166 Ariz. 254, 255, 801 P.2d 489, 490 (App.1990). Defendant first argues that the entire search and seizure was tainted from the start because the officers stopped him merely as a pretext to search for evidence of a more serious crime. He argues that no reasonable police officer would have taken the action the officers took in crossing the median, following, and then pulling him over. We disagree.

▮ Regardless of the officer's underlying motives, a stop is not invalid if there exists a valid, objective reason to make the stop. Id. at 257, 801 P.2d at 492. See also State v. Jeney, 163 Ariz. 293, 296, 787 P.2d 1089, 1092 (App.1989); United States v. Garcia, 897 F.2d 1413, 1419 (7th Cir.1990). We have held that a violation of the traffic laws provides a sufficient objective ground to stop a vehicle. State v. Acosta, 166 Ariz. at 257, 801 P.2d at 492. See also State ex rel. Hyder v. Superior Court, 114 Ariz. 337, 340, 560 P.2d 1244, 1247 (1977). Here, defendant concedes that he committed an improper lane change. The officers therefore had an objectively valid reason to stop defendant. Even if the officers did suspect the two men of more serious crimes—a fact issue we need not reach—

2. At trial, the Department of Public Safety chemist testified that vitamin super B is often mixed with cocaine.

3. U.S. Const., amend. IV provides:
   The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but

upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

4. Swanson also argues other errors during the trial, which we need not address because of our disposition on the suppression issue.

this did not make the traffic stop unconstitutional. As we stated in *Jeney,* "[t]he fact that evidence of alleged drug offenses might come to the officers' attention when they effected the arrest does not make the officers' otherwise lawful conduct invalid because of an alleged subjective motivation." 163 Ariz. at 296, 787 P.2d at 1092. The fact that Officers Hash and Rush pulled defendant over for a minor traffic violation does not taint the stop with unconstitutionality.

## B. *Consent to Search*

Defendant next argues that he gave no consent to search the vehicle. Alternatively, he argues that if any consent was given, it was invalid because it was procured after the stop had exceeded the time reasonably necessary to effectuate the traffic stop.

■■■ The trial court's factual determinations on the issue of giving consent will not be overturned unless clearly erroneous. *See Acosta,* 166 Ariz. at 257, 801 P.2d at 492 ("The validity of consent is determined by considering, in light of all the circumstances, whether the consent was voluntary"). Having reviewed the evidence, including a tape recording that Officer Rush made of his conversation with defendant prior to the search, we conclude that the trial court's determination that defendant voluntarily consented to the search was not clearly erroneous. We do not reach the issue whether the consent was invalid because it was obtained after an unreasonable duration, because the following discussion reveals the search and seizure were unconstitutional for other reasons.

## C. *Scope of the Search*

Although the trial court concluded that defendant consented to the officers' search of the car, it also concluded that the officers' search exceeded the scope of defendant's consent:

> An unqualified consent to search a vehicle does not give law enforcement officer's [sic] license, absent some further basis, to start ripping or tearing a car

apart. This would, in the Court's mind, apply to removing door panels.

This holding is factually supported.

■■■ It is well established that "the scope of a consent search is limited by the breadth of the actual consent." *United States v. Garcia,* 897 F.2d 1413, 1419 (7th Cir.1990). Whether a consensual search remained within the bounds of the actual consent is a question of fact to be determined from the totality of circumstances; the trial court's finding will be affirmed unless clearly erroneous. *United States v. Espinosa,* 782 F.2d 888, 892 (10th Cir.1986).

■■■ We agree with the trial court that the scope of the officers' search exceeded the breadth of defendant's actual consent in this case. To begin with, a consensual search is limited by the items about which the officer inquired as a predicate to the search. *Garcia, supra.* Here, similar to *Garcia,* Officer Hash asked defendant if he had any guns, large sums of money, or drugs in the car. The court in *Garcia* held that the consent to search the car for similar items did not include searching behind the door panels:

> Without more, police can only search areas these items may reasonably be expected to be found. The opening of door panels is *not* normally included in this set of areas to be searched. Such a search is inherently invasive, and extends beyond the consent given under these circumstances.

897 F.2d at 1419–20.

■■■ Prior to asking for consent, Officer Rush activated a tape recorder hidden in his shirt pocket. The recorded conversation reveals that the officers repeatedly informed defendant that the scope of the search they wished him to consent to would involve "taking a look in the car." In explaining the consent form to defendant, the following exchanges took place:

> OFFICER: Okay, what I need you to do is to go ahead and read this and then I need your signature right here.

> [DEFENDANT]: What is this?

OFFICER: Basically it is you're giving us consent to take a look in your car. Okay?

[DEFENDANT]: I just don't really want to sign, [inaudible].

OFFICER: All right. Okay. Did you read it or do you want me to explain anything to you?

[DEFENDANT]: What it's saying, really.

OFFICER: Basically all it is is you're giving us consent to take a look in the vehicle.

. . . . .

OFFICER: Okay. What I need is your signature. Want me to do this? Basically like I said, it's you're giving us consent. We'd like to have it on tape or [inaudible].

[DEFENDANT]: You can go in and look.

OFFICER: You don't mind if we look?

[DEFENDANT]: [Inaudible].

OFFICER: You're sure? You don't want to sign it though?

[DEFENDANT]: I don't want to sign it.

OFFICER: Okay. Okay basically what it's saying here, I'll tell you. I have been duly advised of my constitutional rights, and do consent to the search required. I have been duly [inaudible] search warrant obtained for [inaudible].

[DEFENDANT]: [Inaudible].

OFFICER: So basically what it is, you're giving us permission to take a look in the car. Okay? That's all it is. If you don't want to sign it, you know, that's fine.

[DEFENDANT]: You can look.

OFFICER: It is okay if we take a look in the vehicle?

[DEFENDANT]: I can't stop you.

OFFICER: You guys don't mind then?

[DEFENDANT]: [Inaudible].

OFFICER: Like I said all it is, is basically a consent to search.

[DEFENDANT]: If you guys are going to search me, you're going to search.

OFFICER: Are you sure?

[DEFENDANT]: [Inaudible].

We agree with the trial court that consent to "take a look in the vehicle" does not encompass the further intrusion of "tearing a car apart" by removing the door panels. *See Garcia, supra. See also State v. Murray,* 151 N.J.Super. 300, 376 A.2d 1255 (App.Div.1977) (officer exceeded permissible scope of search when he "invaded the structural integrity of the vehicle itself" upon finding an empty roach clip and a vial containing traces of marijuana on floor of van). The officers' removal of the door panel invaded the structure of the automobile and far exceeded the scope of "taking a look in the car" to look for guns, large sums of money, or drugs.[5] The removal of the door panel was not within the scope of the search to which defendant consented.

### D. *Probable Cause*

The state concedes that, at the time the officers began the search, they lacked probable cause to believe the car contained evidence of criminal activity. The state supports the initial lawfulness of the search solely on the basis of defendant's consent to search. However, because the search exceeded the scope of defendant's consent to search, we must examine whether the added intrusion was justified. The trial court upheld the search based on the state's evidence that the door panel screws had been tampered with and the officers' knowledge that drugs are often concealed behind door panels.[6] The court determined

---

**5.** The standard for determining the scope of a suspect's consent is one of objective reasonableness, which is "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno,* — U.S. —, —, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297 (1991). In *Jimeno,* the Supreme Court held that a general consent to search the car for narcotics included consent to search a paper bag lying on its floor. We do not believe, however, that the typical reasonable person would find that consent to "take a look in the car" for drugs, weapons, or large sums of money included consent to dismantle the car in the process.

**6.** Rush testified that it is "common knowledge in law enforcement" that drugs are often secreted behind car door panels. However, Rush did

that this gave the officers a "reasonable basis" to search behind the door panel:

> Officer Rush testified the screws on the left rear passenger door panel appeared to have been tampered with. They were loose. He pointed this out to Officer Hash who then proceeded to remove the door panel and find what the officers believed to be narcotics. Officer Rush's observation, coupled with both officers' experience and training that narcotics are often concealed behind a car's door panel, provided a *reasonable basis* to remove the panels.

(Emphasis added.)

■ The trial court erred in using "reasonable basis" as the standard to justify the search. In order for a warrantless search to be lawful, it must be supported by probable cause. *State v. Richards*, 110 Ariz. 290, 291, 518 P.2d 113, 114 (1974). *Cf. Acosta, supra* (reasonable suspicion to believe car was stolen did not justify officer's search into door panel).

■ The trial court's failure to apply the correct standard in denying the motion to suppress is not necessarily fatal; this court will affirm the trial court's ruling even if the trial court reached the correct conclusion on incorrect reasoning. *State v. Perez*, 141 Ariz. 459, 464, 687 P.2d 1214, 1219 (1984). Thus, if we were to determine that the officers had probable cause to extend the search into the space behind the door panels, we would uphold the denial of the motion to suppress. However, we find the officers lacked the requisite probable cause.

■ Probable cause gives an officer the constitutional authority to search areas of the vehicle outside the scope of the suspect's consent. *See United States v. Garcia*, 897 F.2d 1413 (7th Cir.1990). Probable cause to search is information sufficient to justify a belief by a reasonable person that an offense has been or is being committed, *State v. Richards, supra,* and that items connected with that crime will be found in the place the officer proposes to search. *State v. Carter*, 145 Ariz. 101,

110, 700 P.2d 488, 497 (1985). Although the officer need not have in hand evidence that would suffice to convict, probable cause cannot rest upon a mere suspicion that a crime has occurred. *State v. Hutton*, 110 Ariz. 339, 341, 519 P.2d 38, 40 (1974); *State v. Howard*, 163 Ariz. 47, 50, 785 P.2d 1235, 1238 (App.1989).

■ Among the facts justifying a finding of probable cause, the state argues, is the officers' testimony that, although defendant and his passenger appeared calm at the start of the search, they became "nervous" when Officer Rush opened the right rear door. The state contends that a change in a suspect's demeanor can support an inference that there is something incriminating to be found, *citing Alicea v. Commonwealth*, 410 Mass. 384, 573 N.E.2d 487 (1991). However, that case does not support the proposition that a defendant's nervousness, at the end of a 45–minute traffic stop, provides probable cause to dismantle his car. Nervousness alone is not enough to establish probable cause for such an intensive search.

Officer Hash testified that defendant was "kind of nervous, or maybe a little bit anxious to move on." He was "[j]ust kind of moving around, and more being in a hurry to leave." Sergeant Lane testified that defendant and his passenger were "very polite, very courteous" while talking with him while Rush and Hash searched the car, although "their heads were turned looking at what the officers were doing," and as the officers searched the middle of the car near the rear doors "the conversation changed a little bit in that it was more fragmatic," and "the types of answers were shorter." In the context of a 45–minute wait, standing beside a busy interstate highway, during which the officers were dismantling the interior of the vehicle, we do not find this behavior unusual.

The state also contends that the officers' knowledge of the "habits of drug carriers," including a common practice of hiding drugs in car door panels, contributed to establish probable cause to search beyond the scope of defendant's consent in this case. *See, e.g., State v. Brown*, 370 So.2d

not relate that "knowledge" to his personal experience.

547 (La.1979) (fact that defendant's behavior correlates with elements of drug courier profile may be considered, along with other information known to the officer at the time of the stop). However, the only facts the officers pointed to in this case to establish a "drug courier profile" were that defendant and his passenger were travelling east on an interstate highway with electronic paging equipment and a cellular phone, in a rental car.

At the time of defendant's traffic stop, the officers were participating in the Violator Directive Patrol Program, a special detail designed to reduce accidents, apprehend fugitives, and recover stolen vehicles. As part of that program, the officers had been instructed to look for vehicles that had telephones, pagers, CBs, or police scanners, travelling east to west on interstate roads, as potential drug couriers, or "mules." Officer Rush testified that his "suspicion that something was wrong" arose in this case because "[y]ou have these guys going to New York in a rental car to a family reunion, and they have all this electronic gear, that just doesn't add up to me, that's suspicious to me." The coordinator of the Violator Directive Patrol Program testified that contraband is often found in rental vehicles travelling from west to east, and the presence of cellular phones, CB radios, "fuzz busters," or pagers, were also often indicia of contraband in a car.

In our opinion, these indicia of a "drug courier profile" do not give rise to expanding a mere suspicion into probable cause. As defendant correctly points out, this description fits any number of other individuals not engaged in criminal activity, and is an insufficient factual basis for probable cause to overcome the fourth amendment's warrant requirement. *See, e.g., State v. Houpt*, 169 Ariz. 550, 821 P.2d 211 (1991) (defendant's purchase of airline ticket for cash, check of heavy suitcase, and extreme nervousness while awaiting to board flight, did not even constitute reasonable suspicion that defendant was involved in a narcotics transaction). A similar general profile has been criticized as "so vague and inclusive that it would describe virtually every young black person arriving from the

West Coast." *State v. Matthews*, 366 So.2d 1348 (La.1978) (discussing factors of the "Detroit Profile" of suspected narcotics couriers, including that a young black male arrived by plane from the West Coast, acted nervous, and had only one piece of luggage). We find no evidence in this record that the officers' reliance on any "drug courier profile" was information sufficient to establish probable cause that a crime was being committed by this defendant and that items related to that crime would be found where the officers searched. *See, e.g., State v. Brown*, 370 So.2d 547, 550 (La.1979) (courier profile correlation by itself does not provide reasonable cause to detain a suspect, but is admissible at a suppression hearing only "in conjunction with other more particularized information as to the accused's criminal conduct"). Although the profile might arouse the officers' suspicion, mere suspicion does not constitute probable cause.

Finally, the state cites *United States v. Garcia*, 897 F.2d 1413 (7th Cir.1990), in support of its position that the evidence the doorscrews had been tampered with provided probable cause to search behind the door panels. In *Garcia*, probable cause developed during the course of the search to which the defendant had consented. The officers developed suspicions based on apparent tampering with the vehicle's door:

> During the search, [Officer] Baker's suspicions were aroused when he noticed the lack of window cranks and door handles on both doors and mismatched and ill-fitting screws that held the interior door panels in place. Determining this to be suspicious, Baker and Olivero inspected the door panels more closely. While looking through the window slot they observed grey packages wedged inside the door. Based on their visual observations, Baker and Olivero removed the driver's side door panel and found ten packages wrapped in duct tape. The packages were approximately two to three inches thick, twelve inches long, and six inches wide. Baker and Olivero opened one package with a knife and discovered marijuana.

*Garcia*, 897 F.2d at 1416. The court upheld this warrantless search behind the

door panel, not on the evidence that the door hardware had been tampered with, but on the officers' observation of packages wedged inside the door:

> In this case, however, we believe the dismantling of the doors was justified by probable cause. While conducting the consensual visual search, Baker's suspicions were aroused by the lack of door handles and the mismatched and ill-fitting screws on the door panels. Investigating more closely, *Baker spotted packages inside the door while looking through the window opening. This visual observation established the probable cause for the troopers to extend their search and take apart the door.*

*Id.* at 1420 (emphasis added).

The difference between the facts in *Garcia* and in this case are readily apparent. There, the officers did not immediately remove the door panel when their suspicions were aroused by evidence of tampering.[7] Rather, they followed up with further investigation, which was brief and non-intrusive. This further investigation led to the discovery of facts establishing probable cause to remove the panel and search inside the door. *See also Alicea v. Commonwealth*, 410 Mass. 384, 573 N.E.2d 487 (1991) (trooper used his flashlight to look down through window casing, and observed partially obscured object at bottom of door frame).

Officers Rush and Hash may have had their suspicions raised by the loose, defaced screws on the door panel. These suspicions might have been enough to warrant further investigation. *Cf. Garcia, supra.* Whether further investigation might have led to probable cause to search inside the door is merely conjecture. We do not propose here to announce just what steps the officers might have taken to investigate further. We merely hold that, at the point the search extended behind the door panel, probable cause was lacking and the officers conducted an unreasonable search beyond the scope of defendant's consent, in violation of the fourth amendment. The trial court therefore erred in denying defendant's motion to suppress the evidence discovered during that search.[8]

The conviction is reversed and the case is remanded with directions to grant the defendant's motion to suppress.

CLABORNE and LANKFORD, JJ., concur.

---

7. Contrary to the officers' conduct in *Garcia*, it is apparently the standard operating procedure of the officers here to "pop" all door panels when permission to search is obtained.

8. Because we find that the search exceeded the scope of the consent and was not backed by probable cause, we did not address whether defendant's consent was invalid because, as he

argues, the officers exceeded the scope of the traffic stop by keeping him for an inordinate length of time. We similarly need not determine whether the trial court erred in not severing the trials of defendant and his passenger or in the admission of evidence of which defendant complains.