769 A.2d 879

Astley Leroy ROWE

v.

STATE of Maryland.

No. 73, Sept. Term, 1999.

Court of Appeals of Maryland.

April 4, 2001.

426

Julia Doyle Bernhardt, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Steven L. Holcomb, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY,* RAKER, WILNER, CATHELL, HARRELL, JJ.

---

* Rodowsky, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IX, Section 3A, he also participated in the decision and adoption of this opinion.

BELL, Chief Judge.

The issue this case presents is the legality of a traffic stop of the petitioner, Astley Leroy Rowe, in the early morning hours, based on a State Trooper observing the van the petitioner was driving cross, by about eight inches, the white edge-line separating the shoulder from the traveled portion of the highway, return to the travel portion and, a short time later, touch the white edge line. In view of the trooper's knowledge that, at the time of the occurrence, people are coming home from bars and are getting tired, he effected a stop, allegedly for the benefit of the petitioner. The trial court found that the stop was legal and, therefore, denied the petitioner's motion to suppress evidence uncovered as a result of the stop. Affirming the petitioner's convictions, the Court of Special Appeals agreed. We shall reverse.[1]

## I.

Having pulled into a median cross-over on Interstate 95 in Cecil County, in order to go south, Trooper Stephen Jones of the Maryland State Police observed the petitioner's van, "the only one in the area," proceeding southbound in the far right lane, the slow lane, traveling at a speed slower than the 65 mph speed limit. He indicated that the petitioner could not have missed seeing him in the crossover as he passed. Trooper Jones followed the van and observed it for approximately 1.2 miles. During that time, Trooper Jones paced the van, determining it to be traveling at between 50 and 54 miles per hour. He also observed it cross the white edge-line onto the shoulder:

"The vehicle crossed the white edge line on the right side of the shoulder, about eight inches over that white edge line on to the shoulder or rumble strips. It hit those rumble strips

---

1. The petition for writ of certiorari presented a second issue: whether, if the crossing and touching of the white edge line in this case justified a stop to determine whether the driver was impaired, the detention of the driver after it has been determined that there is no impairment is unreasonable under the Fourth Amendment.

and at the time when he hit those rumble strips he swerved back into the slow lane."

Trooper Jones later saw the van touch the white edge-line again. Describing what he saw as "the tires directly on the white edge line and came back into the slow lane once again," he characterized the van as having "swerved or weaved back onto the white shoulder edge line once again." Trooper Jones then made the traffic stop, giving the following reason for doing so:

"[f]or failing to drive in a single lane. And at that time it was one o'clock in the morning. For me, it's when people are coming home from the bars the person could have possibly been intoxicated. It's also a time, it's late in the evening when people start to get tired and a lot of our accidents are people falling asleep at the wheel. I checked on the benefit of the driver after he failed to drive in a single lane."

Trooper Jones approached the van on the passenger side, identified the petitioner, the only occupant, as the operator and inquired whether the petitioner was getting tired and whether he had anything to drink. When the petitioner answered "no" to both questions, the trooper asked why the petitioner was "swerving [and] weaving in and out of his lane," to which the petitioner replied he had dropped something on the floor and was reaching to pick it up. Trooper Jones did not detect an odor of alcohol, and he testified that he was "fairly certain that [the petitioner] wasn't under the influence of alcohol."

While waiting for the petitioner's drivers licence and registration, Trooper Jones made a "quick scan" of the interior of the vehicle, observing two pieces of hard-sided luggage in the rear most part of the van. The petitioner produced a Florida driver's license and a car rental contract. Seeing that the petitioner's name was not on the rental contract, and that the contract did not provide for any additional drivers, the trooper ordered the petitioner out of the vehicle, noting, "[b]ecause [the petitioner] was driving a vehicle where the renter of the

vehicle is not present and he is not authorized to drive the vehicle so I'm going to get the story straight before he proceeds on down the road."

Waiting for the license and warrant check he requested, Trooper Jones discovered, upon an examination of the rental car contract, that it had expired five days earlier. The petitioner offered the explanation that he borrowed the van from a friend, that he needed it to go to Florida to check on his tractor-trailer that was in a repair shop there, and he did not know that the rental contract had expired. Having learned that the petitioner's Florida driver's license was valid, although his driving privileges in New York had been suspended, Trooper Jones requested the dispatcher to run a registration check on the license tag, and attempt to contact the rental company. The officer explained that he did this to clear up "the discrepancies on [the] contract." Trooper Jones also requested a criminal history check of the petitioner.

While awaiting the additional information, the trooper elicited from the petitioner that the luggage in the van was his. He then asked the petitioner if he had anything illegal in the vehicle, including guns or drugs, to which the petitioner responded in the negative. Trooper Jones then requested permission to search the vehicle, and the petitioner consented both verbally and by signing a written consent form. He testified that when he opened the rear hatch of the petitioner's van, he immediately smelled what he believed to be marijuana. The subsequent search of the luggage uncovered approximately 34,000 grams (about seventy-seven pounds) of marijuana.

The petitioner was arrested and charged with possession of marijuana with the intent to distribute, possession of marijuana and a violation of Maryland Code (1977, 1999 Repl.Vol.), § 18–106(b) of the Transportation Article,[2] driving a rental

---

2. Maryland Code (1977, 1999 Repl.Vol.), § 18–106(b) of the Transportation Article provides:

"(b) if a person rents a motor vehicle under an agreement not to permit another person to drive the vehicle no other person may drive

vehicle in violation of the rental agreement. He was also issued warnings for driving "50 in a 65"[3] and failing to drive in a single lane. *See* § 21–309.

In the Circuit Court for Cecil County, the petitioner moved to suppress the marijuana, arguing that he did not knowingly and voluntarily consent to the search of the van and that, even if he consented, the trooper did not have probable cause to make the stop. Denying the motion to suppress, the motions court stated:

> "Well, as to the stop, I grant you that the defendant was not flagrantly violating the law, but at the hour of the night and what he was doing was enough to cause suspicion of the Trooper as to whether or not he was going to sleep or he had a little bit too much to drink and I think he had a duty to and the right to stop him.

---

the rented motor vehicle without the consent of the lessor or his agent."

**3.** There is a real question as to whether, under the circumstances of this case, there is a speeding charge for which the petitioner could have been cited and, therefore, warned against. There is a provision that addresses minimum speed limits, Maryland Code (1977, 1999 Repl. Vol.), § 21–804 of the Transportation Article. It provides:

> "(a) unless reduced speed is necessary for the safe operation of the vehicle or otherwise is in compliance with law, a person may not willfully drive a motor vehicle at such a slow speed as to impede the normal and reasonable movement of traffic.
>
> "(b) (1) if, on the basis of an engineering and traffic investigation, the State Highway Administration or a local authority determines that slow speeds on any part of a highway in its jurisdiction impede the normal and reasonable movement of traffic, the State Highway Administration or the local authority may establish a minimum speed limit for that part of the highway.
>
> '(2) unless reduced speed is necessary for the safe operation of the vehicle or otherwise is in compliance with law, a person may not drive a vehicle below a minimum speed limit established under this subsection.
>
> '(3) A minimum speed limit established under this subsection is effective when posted on appropriate signs giving notice of the limit.' "

There was no evidence of a minimum speed limit in this case. Nor is there evidence that the petitioner's speed impeded the movement of traffic. Indeed, the evidence was that the petitioner's van was the only traffic in the area.

"Once he stopped him, we have all heard testimony about that but I accept the Trooper's testimony that he advised the defendant of his rights with respect to the search. "I find further that the defendant consented to it. Even if he hadn't consented to it, he was within his rights to search the vehicle because he found out that the defendant was operating the rental vehicle, which he was not the authorized driver and, in fact, the rental the [sic] agreement had expired. So I deny the motion to suppress."

A jury found the petitioner guilty of possession of marijuana with intent to distribute and violation of § 18–106(b). The petitioner noted an appeal to the Court of Special Appeals.

In an unreported opinion, the intermediate appellate court affirmed the judgments of the trial court. That court held that the traffic stop was justified because the van the petitioner was driving was "weaving off the highway" and that the investigatory detention was reasonable,[4] there being "absolutely nothing to indicate that the trooper used up an inordinate amount of time in attempting to resolve [the rental car contract] matter." Critical to that court's latter determination were the finding that the defendant had violated § 21–309 and the fact that he was not listed on the rental agreement.

We granted the petitioner's Petition for Writ of Certiorari, *Rowe v. State*, 356 Md. 17, 736 A.2d 1064 (1999), to address the important issue this case presents.

## II.

Our review of the trial court's denial of the petitioner's motion to suppress under the Fourth Amendment is based solely on the record of the suppression hearing. *See Cartnail v. State*, 359 Md. 272, 282, 753 A.2d 519, 524 (2000); *Ferris v.*

---

4. This was an alternative basis for decision. The Court of Special Appeals was not at all convinced that the length of the detention was reserved for appellate review, reasoning:

"At the conclusion of the suppression hearing, appellant's counsel did not argue that he was detained for an impermissibly long period; therefore, this argument is not preserved for appellate review."

*State,* 355 Md. 356, 368, 735 A.2d 491, 497 (1999); *In Re Tariq A R–Y,* 347 Md. 484, 488, 701 A.2d 691, 692 (1997). We review the facts found by the trial court in that record in the light most favorable to the State, or stated differently, to determine whether the trial court's findings of fact are clearly erroneous. *See Cartnail,* 359 Md. at 282, 753 A.2d at 525; *Ferris,* 355 Md. at 368, 735 A.2d at 497; *In Re Tariq A R–Y,* 347 Md. at 488, 701 A.2d at 693. Legal conclusions, however, are reviewed "*de novo.*" *Cartnail,* 359 Md. at 282, 753 A.2d at 525; *Ferris,* 355 Md. at 368, 735 A.2d at 497.

The Fourth Amendment protects against unreasonable searches and seizures.[5] A person is considered "seized" for Fourth Amendment purposes if, under all of the circumstances, a reasonable person in the position of the suspect would believe that he or she was not free to leave or to terminate the encounter. *Florida v. Bostick,* 501 U.S. 429, 436, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389, 400 (1991). A traffic stop of a motorist is a seizure which implicates the Fourth Amendment. *See United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605, 613 (1985). Therefore, even temporary or limited restraints on the liberty of a person during a traffic stop may not be constitutionally permissible if, under all of the circumstances, the traffic stop was unreasonable. As this Court stated in *Cartnail,* 359 Md. at 284, 753 A.2d at 525–26 (quoting *Sharpe,* 470 U.S. at 682, 105 S.Ct. at 1573, 84 L.Ed.2d at 613 (in turn citing *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879, 20 L.Ed.2d at 905)):

"The reasonableness of an investigative traffic seizure is evaluated under a dual inquiry:

'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the

---

5. The Fourth Amendment, U.S. Const. Amend. IV, applicable to the individual states through the Fourteenth Amendment, provides:

"The right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, · supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

circumstances which justified the interference in the first place.' "

Where the police have probable cause to believe that a traffic violation has occurred, a traffic stop and the resultant temporary detention may be reasonable. *See Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89, 95 (1996). A traffic stop may also be constitutionally permissible where the officer has a reasonable belief that "criminal activity is afoot." *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889, 911 (1968). Whether probable cause or a reasonable articulable suspicion exists to justify a stop depends on the totality of the circumstances. *See United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Thus, the Supreme Court has held that the Fourth Amendment is violated:

> "[W]here there is neither probable cause to believe nor reasonable suspicion that the car is being driven contrary to the laws governing the operation of motor vehicles or that either the car or any of its occupants is subject to seizure or detention in connection with the violation of any other applicable laws."

*Delaware v. Prouse,* 440 U.S. 648, 650, 99 S.Ct. 1391, 1394, 59 L.Ed.2d 660, 665 (1979).

The petitioner in this case was stopped for "failing to drive in a single lane," in violation of § 21–309, and because the officer wanted to "check on the benefit of the driver for failing to drive in a single lane." Section 21–309 prescribes the rules of the road applicable "[o]n any roadway [6] that is divided into two or more clearly marked lanes for vehicular traffic." § 21–309(a). Subsection (b) of § 21–309 addresses the situation presented in this case. It provides:

> "(b) A vehicle shall be driven as nearly as practicable entirely within a single lane and may not be moved from

---

**6.** "Roadway" is defined as "that part of a highway that is improved, designed, or ordinarily used for vehicular travel, other than the shoulder." § 11–151(a).

that lane or moved from a shoulder or bikeway into a lane until the driver has determined that it is safe to do so."

§ 21–309.[7] Focusing only on the plain language of the statute, see *Mid–Atlantic Power Supply Ass'n v. Public Service Com'n of Maryland*, 361 Md. 196, 204, 760 A.2d 1087, 1091 (2000); *Mayor & City Council of Baltimore v. Chase*, 360 Md. 121, 128, 756 A.2d 987, 991 (2000), to be in compliance, a vehicle must be driven as much as possible in a single lane and movement into that lane from the shoulder or from that lane to another one cannot be made until the driver has determined that it can be done safely. Thus, more than the integrity of the lane markings, the purpose of the statute is to promote safety on laned roadways. This is consistent with its context,

---

**7.** The remainder of TR § 21–309 provides:

"(c) On a roadway that is divided into three lanes and that provides for two-way movement of traffic, a vehicle may not be driven in the center lane except:

'(1) While overtaking and passing another vehicle going in the same direction and while the center lane is clear of traffic within a safe distance;

(2) In preparing to make a left turn; or

(3) When the center lane is allocated exclusively to traffic moving in the same direction that the vehicle is going and the allocation is designated by a traffic control device.'

"(d) The driver of a vehicle shall obey the directions of each traffic control device that directs specified traffic to use a designated lane or that designates those lanes to be used by traffic moving in a particular direction, regardless of the center of the roadway.

"(e) The driver of a vehicle shall obey the directions of each traffic control device that prohibits changing lanes on sections of a roadway.

"(f) On a roadway that has two or more lanes for traffic moving in the same direction, the driver of any truck, truck tractor, trailer, or bus shall obey the directions of each traffic control device that requires the vehicle to be driven in a certain lane.

"(g) On a roadway along which a two-way left turn lane has been provided through traffic control devices, vehicles may not enter that lane except when preparing for or making a left turn from or into the roadway or when preparing for or making a U-turn, and may enter only if the lane is clear of an opposing movement.

"(h) A vehicle shall be driven within a lane described under subsection (g) of this section the shortest distance practicable prior to making a left turn or U-turn or after making a left turn.

"(i) On roadways along which a two-way left turn lane has been placed, left turns shall be made only from within such lane."

the placement of the statute in § 21–309, the remainder of which provides:

"(c) On a roadway that is divided into three lanes and that provides for two-way movement of traffic, a vehicle may not be driven in the center lane except:

'(1) While overtaking and passing another vehicle going in the same direction and while the center lane is clear of traffic within a safe distance;

(2) In preparing to make a left turn; or

(3) When the center lane is allocated exclusively to traffic moving in the same direction that the vehicle is going and the allocation is designated by a traffic control device.'

"(d) The driver of a vehicle shall obey the directions of each traffic control device that directs specified traffic to use a designated lane or that designates those lanes to be used by traffic moving in a particular direction, regardless of the center of the roadway.

"(e) The driver of a vehicle shall obey the directions of each traffic control device that prohibits changing lanes on sections of a roadway.

"(f) On a roadway that has two or more lanes for traffic moving in the same direction, the driver of any truck, truck tractor, trailer, or bus shall obey the directions of each traffic control device that requires the vehicle to be driven in a certain lane.

"(g) On a roadway along which a two-way left turn lane has been provided through traffic control devices, vehicles may not enter that lane except when preparing for or making a left turn from or into the roadway or when preparing for or making a U-turn, and may enter only if the lane is clear of an opposing movement.

"(h) A vehicle shall be driven within a lane described under subsection (g) of this section the shortest distance practicable prior to making a left turn or U-turn or after making a left turn.

"(i) On roadways along which a two-way left turn lane has been placed, left turns shall be made only from within such lane."

This interpretation is also consistent with that given essentially identical statutes by courts that have considered this issue. *See Crooks v. State,* 710 So.2d 1041, 1043 (Fla.App. 1998): *Montana v. Lafferty,* 291 Mont. 157, 162–63, 967 P.2d 363, 366 (1998); *State v. Cerny,* 28 S.W.3d 796, 800–01 (Tex. App.2000); *Hernandez v. State,* 983 S.W.2d 867, 871 (Tex.App. 1998). *See also State v. Gullett,* 78 Ohio App.3d 138, 604 N.E.2d 176, 180–81 (1992) ("Where a vehicle is driven on a roadway with no other traffic present, there was no speeding, erratic driving or other conduct, except for the edge line incident,[8] to indicate that appellee was impaired, the balance is in favor of the right of privacy and against the need for a stop"); *Corbin v. State,* 33 S.W.3d 90 (Tex.App.2000) ("statute presumes a certain degree of common sense will be applied to the review of a driver's actions by requiring that a driver shall drive 'as nearly as practical entirely within a single lane . . . .' *and* that he may not move from the lane unless the movement can be made safely").

In *Lafferty,* the applicable Montana statute, § 61–8–328, provided that when a "roadway has been divided into two or more clearly marked lanes for traffic . . . [a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." *Id.* at 162, 967 P.2d at 366. Construing that statute, the Supreme Court of Montana, *id.,* rejected the State's argument that the defendant violated it, opining:

---

8. The statute in that case provided:
 "Whenever any roadway has been divided into two or more clearly marked lanes for traffic, . . . the following rules apply:
 '(A) A vehicle or trackless trolley shall be driven, as nearly as is practicable, entirely within a single lane or line of traffic and shall not be moved from such lane or line until the driver has first ascertained that such movement can be made with safety.' "

"In our view ... the statute relates to moving from a marked traffic lane to another marked traffic lane. Here, Lafferty did not move from one of the marked eastbound traffic lanes on Highway 90 to the other without checking to be sure she could do so safely. She merely crossed onto and barely over the fog line on the far right side of the right traffic lane in which she was traveling. We conclude that this driving was not 'illegal' driving under § 61–8–328."

The *Hernandez* court, construing a similar statute, § 545.060 of the Texas Transportation Code,[9] reached a similar conclusion. The court stated:

"We believe the statutory language shows a legislative intent that a violation of section 545.060 occurs only when a vehicle fails to stay within its lane *and* such movement is not safe or is not made safely. Neither the current provision in the Transportation Code nor the original statute creates two separate offenses, but rather only one: moving out of a marked lane when it is not safe to do so."

*Id.* at 871. It held that a single instance of crossing a lane dividing line by eighteen to twenty-four inches into a lane of traffic traveling the same direction when the movement is not shown to be unsafe or dangerous did not provide a reasonable basis for suspecting that the defendant had committed a "ticketable" traffic offense.

*Crooks* is to like effect. There, holding, despite the fact that the defendant's vehicle crossed the edge line of the shoulder on three occasions, that there was no violation of the pertinent statute and, therefore, the officer had no objective basis to make the stop, the court concluded:

---

9. Section 545.060 of the Texas Transportation Code provided:
 "Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic the following rules in addition to all others consistent herewith shall apply:
 '(a) The driver of a vehicle shall drive as nearly as practical entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.' "

"Because the record does not establish how far into the right-hand emergency lane Mr. Crooks drove on any of the three occasions, there is no basis to state that he was outside the 'practicable' lane. Even if he was briefly outside this margin of error, there is no objective evidence suggesting that Mr. Crooks failed to ascertain that his movements could be made with safety. Section 316.089 [10] is similar to section 316.155, Florida Statutes (1995), governing the use of turn signals, in that a violation does not occur in isolation, but requires evidence that the driver's conduct created a reasonable safety concern."

*Id.* at 1043. The court also stressed that the defendant's crossing of the edge line did not endanger the officer or others. *But see State v. Smith,* 172 Ill.2d 289, 216 Ill.Dec. 658, 665 N.E.2d 1215 (1996) (holding that the plain language of a statute virtually identical to § 21-309 [11] "establishes two separate requirements for lane usage," to drive in a single lane and move from the lane only after it has been determined that it can be done with safety).

Other courts have also interpreted their statues as requiring more for violation than a momentary crossing or touching of an edge or lane line. *Frasier v. Driver And Motor Vehicle Services Branch (DMV),* 172 Or.App. 215, 220, 17 P.3d 582 (2001) ("When read in context, the words 'practicable' and

---

10. That provision read:
 "Whenever any roadway has been divided into two or more clearly marked lanes for traffic, the following rules, in addition to all others, consistent herewith, shall apply:
 '(1) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.' "

11. That statute, 625 ILCS 5/11-709(a), provided:
 "Whenever any roadway has been divided into 2 or more clearly marked lanes for traffic the following rules in addition to all others consistent herewith shall apply.
 '(a) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.' "

'refrain' demonstrate that the legislature intended that the statute would not be violated unless the driver did not stay within the lane because of an act or omission that was within his control."); *United States v. Guevara Martinez*, 2000 U.S. Dist. LEXIS 7202, at *4 (D.Neb.2000) ("touching or even crossing the broken lane divider twice over a half mile cannot be reasonably interpreted as 'erratic' or unsafe driving, and crossing 'barely into the center lane' must mean the same as driving 'as nearly as practicable' within the same lane."); *State v. Williams*, 86 Ohio App.3d 37, 619 N.E.2d 1141, 1144 (1993) (holding, even as it recognized that "weaving, even within a single lane can justify an investigatory stop[,]" that crossing the lane dividing line by one tire width on two occasions over a two mile stretch of highway, which it characterized as "minor weaving," "is not so unreasonable as to give a legitimate suspicion of criminal activity."). *See State v. Caron*, 534 A.2d 978, 979 (Me.1987) ("A vehicle's brief, one time straddling of the center line of an undivided highway is a common occurrence and, in the absence of oncoming or passing traffic, without erratic operation or other unusual circumstances, does not justify an intrusive stop by a police officer."); *United States v. Gregory*, 79 F.3d 973, 978 (10th Cir.1996), (a "single occurrence of moving to the right shoulder of the roadway ... could not constitute a violation of Utah law and therefore does not warrant the invasion of Fourth Amendment protection.").

The cases in which courts have upheld traffic stops based on violation of statutes similar to § 21–309 involve conduct much more egregious than that in which the petitioner engaged in this case and are distinguishable on that basis. That is true of the cases on which the State relies: in *Smith, supra,* 216 Ill.Dec. 658, 665 N.E.2d at 1217, with no signal being given, the driver's side wheels of the defendant's car crossed over the lane line dividing the left lane from the center lane by at least six inches, remaining there for approximately 100 to 150 yards, and, a short time later, again without signaling, the defendant's car crossed over the lane line dividing the left lane from the right lane by approximately six inches for 150 to 200 yards; in *State v. Swanson*, 172 Ariz. 579, 582, 838 P.2d 1340,

1343 (1992), the defendant, who conceded on appeal that he made an illegal lane change, changed lanes without signaling; in *State v. Acosta,* 166 Ariz. 254, 256, 801 P.2d 489, 491 (1990), the defendant straddled the center lane on at least six occasions; in *Sledge v. State,* 239 Ga.App. 301, 302, 521 S.E.2d 212, 214 (1999), trying to change lanes without signaling, the defendant straddled the middle and slow lanes, causing traffic to "brake and slow in an effort to avoid him," before straddling the middle and left lanes; in *Maddox v. State,* 227 Ga.App. 602, 604, 490 S.E.2d 174, 176 (1997), the defendant weaved across lanes of traffic onto the shoulder; in *State v. Holcomb,* 219 Ga.App. 231, 232, 464 S.E.2d 651, 653 (1995), the defendant weaved from the shoulder of the roadway to the left lane; in *State v. Fisher,* 649 So.2d 604, 606 (La.App.), *writ denied,* 652 So.2d 1344 (La.1995), the defendant weaved from the center lane to the shoulder of the roadway; in *Johnson v. State,* 601 S.W.2d 326, 327 (Tenn.Crim.App.1980), the defendant drove in two lanes.

It is also true of other cases. In *State v. Banks,* 1999 WL 980340, at *1, 1999 Ohio App. LEXIS 5070, at *2 (1999), the defendant drove to the left of the double yellow lines by approximately two and one-half to three feet for approximately ten to fifteen yards almost causing a head-on collision with a vehicle traveling in the opposite direction. Returning to his lane of travel and approaching a red light, the defendant's vehicle skidded to a stop barely avoiding a rear-end collision with a stopped vehicle. Under these circumstances, the court had no trouble concluding that there was reasonable articulable suspicion that appellant committed a marked lanes violation. In *State v. Keiler,* 2000 WL 1499202, at *1, 2000 Wis.App. LEXIS 1000, at *2 (2000), the defendant straddled the lane for about three seconds and slowed down to an unreasonable speed to avoid passing the police officer. The officer's observations in *Commonwealth v. Howard,* 762 A.2d 360, 361 (Pa.Super.2000), included seeing the defendant's car cross, on two occasions, the edge line by one-fourth to one-half of the vehicle's width, being driven down the center of an unmarked highway and crossing the center line. *See State v.*

*Mortensen,* 1998 WL 102186, at *2, 1998 Ohio App. LEXIS 712, at *1 (1998), where there were two instances of the defendant driving outside of the marked lane, when he drove on the berm, a foot outside the right edge line, for one hundred feet and when he swerved over the center line after he passed the trooper.

The conduct that the court in *United States v. Garcia,* 205 F.3d 1182, 1184 (9th Cir.2000) found violative of a statute substantially identical to § 21–309 [12] consisted of the defendant's vehicle "swerving slightly within its lane, not breaking the lane lines," which the arresting officer indicated was "a pattern of an intoxicated driver or tired driver," the vehicle's left side tires crossing into the number one lane and back again, and, as it passed a truck, swerving "over the center yellow line into the paved shoulder throwing dirt and debris up," before it "slightly jerked back" into its lane and continued to pass the truck. Furthermore, the defendant did not challenge the contention that the officer had probable cause for the traffic stop.

We conclude that the petitioner's momentary crossing of the edge line of the roadway and later touching of that line did not amount to an unsafe lane change or unsafe entry onto the roadway, conduct prohibited by § 21–309, and, thus, cannot support the traffic stop in this case.

 Noting the petitioner's concession that an officer's observation of negligent or erratic driving may support a traffic stop on reasonable suspicion of intoxication or fatigue, the State seeks to justify the stop on that basis, arguing:

"This is precisely what the suppression court found when it ruled that "at the hour of the night and what he was doing was enough to cause suspicion" of the Trooper as to wheth-

---

12. The applicable statute provided:

"Whenever any highway has two or more clearly marked lanes for traffic traveling in one direction, vehicles shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has given the appropriate turn signal and ascertained that such movement can be made with safety."

er or not he was going to sleep or had a little bit too much to drink and I think he had a duty to and the right to stop him."

It finds significant this Court's repeated recognition of the State's compelling interest in controlling and preventing drunk driving. *See, e.g., Motor Vehicle Admin. v. Richards,* 356 Md. 356, 374, 739 A.2d 58, 68 (1999) (discussing "the administrative goals of the MVA in ridding Maryland roadways of drunk drivers"); *Hare v. Motor Vehicle Admin.,* 326 Md. 296, 604 A.2d 914, (1992) (noting "[s]tate's interest in protecting its citizens from drunk drivers and, as a means of doing so, encouraging suspected drunk drivers to take the test, thus facilitating their prosecution."); *Motor Vehicle Admin. v. Shrader,* 324 Md. 454, 464, 597 A.2d 939, 943 (1991) (observing "[t]he General Assembly's goal in enacting the drunk driving laws . . . is 'to meet the considerable challenge created by this problem by enacting a series of measures to rid our highways of the drunk driver menace. These measures, some of which are decades old, are primarily designed to enhance the ability of prosecutors to deal effectively with the drunk driver problem.' ") (quoting *Willis v. State,* 302 Md. 363, 369–70, 488 A.2d 171, 175 (1985)) (Cole, J.); *State v. Moon,* 291 Md. 463, 485, 436 A.2d 420, 431 (1981) (Eldridge and Davidson, JJ., dissenting) (mentioning the "societal interest in successful prosecution of drunk drivers").

Several states have recognized that, under the community caretaking function discussed in *Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706, 715 (1973),[13]

---

13. In discussing the community caretaking function in *Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706, 715 (1973) the United States Supreme Court stated:

Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizens contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contact will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate

a police officer may stop a vehicle to ensure the safety of the occupant without a reasonable suspicion of criminal activity. *See, e.g., Crauthers v. State*, 727 P.2d 9, 11 (Alaska App.1986); *Smith v. State*, 301 Ark. 569, 570, 785 S.W.2d 465, 466 (1990); *State v. Moore*, 609 N.W.2d 502, 504 (Iowa 2000); *State v. Vistuba*, 251 Kan. 821, 824, 840 P.2d 511, 514 (1992), *rev'd on other grounds, State v. Field*, 252 Kan. 657, 664, 847 P.2d 1280, 1286 (1993); *State v. Pinkham*, 565 A.2d 318, 319 (Me.1989); *State v. Brown*, 509 N.W.2d 69, 71–72 (N.D.1993); *State v. Rinehart*, 617 N.W.2d 842, 844 (S.D.2000); *State v. Marcello*, 157 Vt. 657, 658, 599 A.2d 357, 358 (1991); *State v. Mireles*, 133 Idaho 690, 693, 991 P.2d 878, 881 (1999); *Wright v. State*, 7 S.W.3d 148, 151 (Tex.Crim.App.1999); *State v. Martinez*, 260 N.J.Super. 75, 78, 615 A.2d 279, 281 (1992); *Provo City v. Warden*, 844 P.2d 360, 364 (Utah App.1992), *aff'd*, 875 P.2d 557 (Utah 1994).

Neither this Court nor the General Assembly has adopted the community caretaking function in this context, and the State has not urged us to do so in this case. Assuming *arguendo*, however, that the community caretaking function is applicable in Maryland, we conclude that the facts present in this record do not rise to the level necessary to justify the stop on the ground that it was a community caretaking stop for the purposes of providing assistance. The record fails to show specific and articulable facts to justify the stop of a motor vehicle pursuant to the so-called police caretaking function.

The Supreme Court of Virginia considered a similar issue in *Barrett v. Commonwealth*, 250 Va. 243, 462 S.E.2d 109 (1995). In that case, the defendant was convicted of driving while under the influence of alcohol. The stop of the vehicle was based on the police officer's observation that the wheels of defendant's truck were partially on the shoulder of the road and partially on a private yard; the officer testified that he

---

vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

stopped the vehicle "only to see if there was a problem." *Id.* at 245, 462 S.E.2d at 110. Before the Supreme Court of Virginia, the Commonwealth conceded that the stop was not based on the investigation of any crime or motor vehicle violation, but argued that the stop was a valid exercise of the police community caretaking function. *See id.* at 246, 462 S.E.2d at 111. The court reversed. With respect to the community caretaking function, the court declined to reach the question of whether the doctrine was applicable in Virginia.

"However, neither *Cady* nor the two subsequent Supreme Court cases applying the so-called 'community caretaking functions' doctrine involved investigative stops and 'seizures'; they involved the admissibility of incriminating evidence discovered during a standard police procedure of inventorying property that had properly been taken into custody. *Cady,* 413 U.S. at 443[, 93 S.Ct. 2523]; *South Dakota v. Opperman,* 428 U.S. 364, 375–76, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *Colorado v. Bertine,* 479 U.S. 367, 375–76, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987). Here, the Commonwealth urges us to extend this doctrine to validate investigative stops and detention of persons not evidently engaged in criminal activity, but who apparently need some police assistance.

"Before we can decide whether this doctrine will be applied in Virginia, we must first consider whether the evidence in this case is sufficient to indicate that Barrett apparently needed police assistance. [The officer] testified that he stopped Barrett 'to see whether there was a problem' because it 'seemed odd' that he would drive partially upon the shoulder of the road and partially on the adjoining yard and not enter the highway.

\* \* \* \*

"As previously indicated, the only justification offered for Barrett's 'seizure' is [the officer's] testimony that he stopped Barrett merely 'to see whether there was a problem' because it 'seemed odd' that he would drive partially upon the shoulder of the road and partially on the adjoining yard and

not enter the highway. Just as the actions in *Zimmerman[ v. Com.*, 234 Va. 609, 363 S.E.2d 708 (1988)] were insufficient to justify a reasonable suspicion of criminal activity, we conclude that Barrett's 'odd' conduct, without more, did not give rise to 'a reasonable suspicion, based on objective facts,' that he needed police assistance. Thus, we need not decide whether the so-called 'community caretaking functions' doctrine will be applied in Virginia when the evidence is sufficient to show that the detained person required police assistance."

*Id.* at 246–48, 462 S.E.2d at 111–12 (citations omitted).

We shall follow the same path as the Supreme Court of Virginia, and under the circumstances presented herein, decline to consider whether the community caretaking function is applicable in Maryland when the evidence is sufficient to show that the vehicle operator requires police assistance.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR CECIL COUNTY AND REMAND THE CASE TO THAT COURT FOR A NEW TRIAL. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY CECIL COUNTY.