16 A.3d 246

**Alton HERRING**

v.

**STATE of Maryland.**

No. 0460, Sept. Term, 2009.

Court of Special Appeals of Maryland.

March 31, 2011.

**64**

Mark Colvin (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, for appellant.

Daniel J. Jawor (Douglas F., Gansler, Atty. Gen., on the brief), Baltimore, for appellee.

Panel: JAMES R. EYLER, WOODWARD, FREDERICK J. SHARER, (Retired, Specially Assigned), JJ.

SHARER, J.

Appellant, Alton Herring, was convicted by a jury sitting in the Circuit Court for Baltimore City of possession of a regulated firearm after having been previously convicted of a disqualifying crime, and wearing, carrying, and transporting a handgun.[1]

Appellant noted a timely appeal and presents three questions for our review:

I. Did the trial court err in denying appellant's motion to suppress?

II. Did the trial court err in refusing to amend the verdict sheet?

III. Did the trial court err in allowing the prosecutor to repeatedly misstate the definition of constructive possession during closing and rebuttal arguments?

Finding neither error nor abuse of discretion, we shall affirm the judgments of the trial court.

## FACTUAL BACKGROUND

On August 19, 2008, at 7:35 p.m., Detective Robert Himes, Detective Ernest McMillan,[2] and Sergeant Young[3] of the Baltimore City Police Department were traveling in an unmarked police car in the 2700 block of West Lanvale Street. Young was driving, Himes was seated in the front passenger seat, and McMillan was in the rear seat behind the driver.

---

1. The trial court sentenced appellant to five years' imprisonment for the possession of the regulated firearm conviction and a concurrent three-year term for the wearing, carrying, and transporting a handgun conviction.

2. In the record, Detective McMillan's surname is also spelled as McMillon.

3. Sergeant Young's first name was not included in the record.

Himes was dressed in plain clothes, but was wearing a black vest with "police written in bold letters on the front and back."

In his trial testimony, Himes recalled that as they traveled on West Lanvale Street, he observed "a blue Chevy Monte Carlo parked approximately two feet away from the curb with its hazard lights on." His attention was drawn to the vehicle because "it was sitting so far away from the curb in the travel lanes with its hazard lights on, we believed it was a disabled vehicle." Himes recalled that Young pulled the unmarked patrol car in front of the Monte Carlo, "almost head-to-head." The three officers got out of the unmarked vehicle, and Himes approached the passenger's side of the Monte Carlo, while McMillan and Young approached the driver's side.

Himes further recalled that it was still daylight and as he looked through the windshield, he observed four occupants in the vehicle.[4] The front seat passenger began to open the door, but Himes told him to remain in the vehicle. The passenger complied. Himes recalled that all the windows, save for the windshield, were tinted, and when he was beside the Monte Carlo, he could not see inside the vehicle. He stated that once the officers were standing next to the vehicle, McMillan "knocked on the window and asked the driver to put the windows down so we could look inside the vehicle." Appellant, whom Himes identified as the driver of the vehicle, lowered the driver's and passenger's side windows at the same time.

As soon as the window was down, Himes saw "the butt of a handgun in the center console." He yelled "gun, gun, gun[,]" moved away from the vehicle, and drew his weapon. Young called for backup, which arrived in two to three minutes. Once additional officers arrived on the scene, the four occupants were removed from the Monte Carlo.

Himes also testified that all four occupants of the Monte Carlo "were within hand's reach of the gun[,]" although he did

---

4. Appellant was tried jointly with the other occupants of the vehicle, but they are not parties to this appeal.

not see any of the occupants touch or hold the gun. He added, however, that due to the way in which the gun rested in the center console, appellant had a "slight advantage" over the other occupants in the ability to reach the gun.

McMillan, too, observed the Monte Carlo "probably maybe two feet away from the curb, illegally parked, with the hazards blinking[.]" When he got out of the unmarked patrol car, his badge was displayed on his shirt. When he approached the driver's side door, the windows were still closed, so he "tapped on the driver's window and told him to roll the window down." In court, McMillan identified appellant as the driver of the Monte Carlo. Appellant was also the owner of the vehicle. McMillan stated that as soon as appellant lowered the windows, he saw "the butt of a handgun sticking out of the front console." He also yelled "gun" multiple times, and he and the other officers drew their weapons. McMillan did not see the gun in the hands of any of the vehicle's occupants.

After backup officers arrived and the occupants were removed from the Monte Carlo, McMillan searched the vehicle. From the glovebox, he recovered $200 in U.S. currency. He also recovered the handgun, which was loaded. A photo of the handgun as it sat in the center console was admitted into evidence.

At trial, the parties entered into the following stipulations: (1) the handgun was a .32 caliber Smith and Wesson long revolver; (2) the handgun was test fired and found to be operable; (3) the gun met the definition of "handgun" in Md. Code (2002), Criminal Law (Crim.Law) § 4–201; (4) the gun was processed for fingerprints, but "there were no suitable latent prints found on the handgun"; and (5) appellant "has been convicted of a crime for which [he] is prohibited from possessing a regulated firearm under the laws of this State."

## DISCUSSION

### I. Suppression

Appellant contends that the trial court erred in denying his motion to suppress. We review that denial based solely on

the evidence developed at the suppression hearing. *See Bost v. State*, 406 Md. 341, 349, 958 A.2d 356 (2008) ("In reviewing the ruling on a motion to suppress evidence, we consider only the evidence contained in the record of the suppression hearing.") The evidence presented at the suppression hearing was as we have set out, above.

McMillan recounted for the suppression court his observations of the events of August 19, 2008, at 7:35 p.m., which ultimately led to the charges against appellant and the other occupants of the vehicle. At the point at which McMillan told the suppression court of the initial contact with appellant's vehicle, he said:

[We] got out of our vehicle—well, got out the vehicle, walked towards the car and once we got towards the car it was—you could see from the front view there was four occupants in the vehicle. Got beside the vehicle, they still had the windows up. Tapped on the window and told them to roll the windows down. Once we got out of our vehicle, badges were displayed showing that we was police.

Because the side windows on the Monte Carlo were tinted, and McMillan could not see through the window, he told the driver to lower the windows. He recalled that the driver and front seat passenger lowered their windows at the same time. Once the window was down, he could see "in clear view, . . . the handle of a handgun sitting in the front compartment[,]" that is, in the center console between the driver and front seat passenger. McMillan made an in-court identification of appellant as the driver of the Monte Carlo.

McMillan testified that upon seeing the gun, he yelled "Gun! Gun!" He and the other officers drew their weapons and ordered the occupants of the Monte Carlo to raise their hands. The occupants complied with the officers' orders. They called for backup, which arrived in two to three minutes. Once backup was on the scene, the officers removed the occupants of the Monte Carlo, and McMillan searched the vehicle. The search yielded the following items: (1) a "hand rolled cigar" that contained suspected marijuana from the area between the

front passenger's seat and the center console;[5] (2) a dollar bill with "a powdered substance" from a "pouch" located on the back of the passenger seat; and (3) $200 in U.S. currency from the glove box.

On cross-examination, McMillan testified that when he approached the driver, he sought "to investigate the vehicle, why was it illegally parked." When asked his basis for saying that the Monte Carlo was illegally parked, he responded: "Based that it was too far in the middle of the street."[6] He added that the Monte Carlo was "[m]ore than . . . two feet from the curb." No citation was issued to appellant for the parking violation.

In denying appellant's motion to suppress, the trial court stated, in part:

> Now, in this particular case, there is no stop. The vehicle is already immobile. All the police do, because of the unorthodox way in which the car is situated—not parked at the curb, out in the street with the hazard lights flashing— they choose to investigate it. Number one, perhaps, to just tell the people to move on. Number two, perhaps, to get a uniformed officer to come along and write them a citation. Or, perhaps, three, to aggressively look for guns and drugs and seeing that they have an opportunity . . . their investigative opportunity is not contrived, or not failure to specify any violation of the law.
>
> * * *
>
> So, the question here is, can police officers get out of their vehicles and walk up to a non-moving vehicle and make observations that don't detain anybody because here the Officer testified that he knocked on the window to get the

---

**5.** Only one of the co-defendant's was charged in relation to the marijuana recovered from the vehicle, but those charges were *nolle prossed* prior to trial.

**6.** Detective McMillan had also commented that the car had its "flashers" on but agreed that was not a reason to conclude that the car was illegally parked.

driver's attention and, as soon as the window opened, he saw the gun, at which point, he had probable cause to arrest everybody that was in close proximity to the gun? In a way you can analogize this case to the knock and talk case, *Scott v. State*, [366 Md. 121, 782 A.2d 862 (2001),] where the Court of Appeals found there was no violation of the Fourth Amendment to knock on people's doors in an effort to have them come speak to them in order to see what probable cause unfolds in that brief encounter.

I find as step one, or phase one, that parking a car with hazard lights on, away from the curb, allows the police, as part of the community caretaking function, to at least inquire of the motorist why he's there, and in that inquiry it's permissible to ask him to roll down his window, at that point—which is like opening the door of the home, or the hotel room. At that point, if the officers observed something that gives them, either a reasonable suspicion to detain the people further or to make an arrest, that occurs.

\* \* \*

I find that speaking to the driver of a stopped vehicle who has his hazard lights on as to why he's there, does not violate the Fourth Amendment. Then, the question becomes, if he can stand there, if he can speak, if you ask him to open his window, do you then develop probable cause to arrest?

\* \* \*

So, as far as legally approached, because it was stopped by the driver's volition, not by the officers, the officer had the reasonable suspicion because of the position of the car and the hazard lights to ask that the tiny step of rolling down the window occur. The officer sees the gun ... on the console, within the close reach of all four occupants, and in plain view of all four occupants.

And regardless of how a jury would find, whether or not they exercised dominion and control for purposes of knowingly transporting a handgun in a vehicle, it's clear that the officer had probable cause to believe that all four of them

jointly and constructively possessed the handgun, for purposes of arresting them.

*　　*　　*

[T]his particular gun, upon its observation, provided probable cause to arrest all four occupants.

Appellant claims that he was seized when McMillan tapped on the car window and told the occupants to roll down the windows; that the seizure was not supported by reasonable and articulable information; thus, he posits, the suppression court erred in denying his motion. He asserts that the officers lacked objective, specific, and articulable facts to show that, at that point, "any of the car's occupants appeared to be sick, in distress, or in need of emergency assistance or that the car appeared to be functioning improperly." According to appellant, in the absence of such facts, or any evidence that the car was impeding traffic, the seizure could not be justified under the community caretaking function.

Appellant further asserts that "the alleged parking violation was simply a pretext for investigating the occupants and contents of the car." Even if the car were illegally parked, he argues, the officers could have issued a parking citation, or asked him to move the car or park closer to the curb. He notes that McMillan could have issued a parking citation without attempting to gather information from appellant, or any of the occupants because parking citations are normally left on the vehicle's windshield. Appellant concludes that because the seizure was unlawful, the fruits of that seizure should have been suppressed.

The State responds that appellant was not seized when McMillan tapped on the car window and asked that it be lowered, and relies on the court's finding that McMillan was entitled to "ask" the driver to lower the window without a seizure having occurred. The State also notes that defense counsel, during cross-examination of McMillan, and argument on the motion, repeatedly stated that McMillan had "asked," rather than commanded, appellant to lower the windows. The State contends that we should credit the interpretation

adopted by the motions court and defense counsel, rather than rely on appellant's interpretation of McMillan's testimony. The State adds that, to the extent there is any ambiguity, the standard of review favors this Court's adoption of the State's interpretation. The State thus asserts that because appellant was not seized, the trial court committed no error in denying his motion to suppress.

The State continues that even if appellant were seized, the officer's actions were supported by reasonable, articulable suspicion. According to the State, McMillan had reasonable, articulable suspicion to approach the car because of the way it was parked, away from the curb, a violation of Md. Code (1977, 2009 Repl. Vol.), Transportation ("T.A.") § 21–1004(a). The State also rebuts appellant's "on the windshield" suggestion, because T.A. § 26–203 requires the police to deliver the citation personally unless the vehicle is unattended.

Finally, the State asserts that the court correctly determined that the officers acted reasonably in accordance with their community caretaking function. The State argues that under this function, the officers' actions must be supported by specific and articulable facts to justify their reasonable belief that the occupants of the vehicle needed aid, or that the automobile needed to be impounded or inventoried. The State contends that because the car was parked two feet from the curb with its hazard lights flashing, the officers could have reasonably believed that the driver or a passenger may have needed assistance, or that the vehicle was not functioning properly.

Of course, the officers could not have made such an inquiry without having the ability to speak to appellant, which still required the lowering of the tinted window. Once the window was lowered, the gun was in plain view, changing the scenario from a potential motor vehicle violation to a weapons violation.

### *Standard of Review*

In reviewing the ruling on a motion to suppress evidence, we view the facts in a light most favorable to the

State as the prevailing party on the motion. *State v. Collins,* 367 Md. 700, 707, 790 A.2d 660 (2002). We also extend great deference to the suppression court's findings of fact and will not disturb those findings unless clearly erroneous. *Byndloss v. State,* 391 Md. 462, 477, 893 A.2d 1119 (2006). Finally, "[a]lthough we extend great deference to the hearing judge's findings of fact, we review, independently, the application of the law to those facts to determine if the evidence at issue was obtained in violation of the law and, accordingly, should be suppressed." *Laney v. State,* 379 Md. 522, 533–34, 842 A.2d 773 (2004) (citations omitted).

 The Fourth Amendment to the Constitution of the United States, made applicable to the States through the Fourteenth Amendment, *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), guarantees, *inter alia,* "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." "When an automobile and its occupants are stopped by police, the resulting detention constitutes a 'seizure' within the meaning of the Fourth and Fourteenth Amendments to the federal constitution, 'even though the purpose of the stop is limited and the resulting detention quite brief.'" *In re Albert S.,* 106 Md.App. 376, 392, 664 A.2d 476, (1995) (quoting *Little v. State,* 300 Md. 485, 493, 479 A.2d 903 (1984)). "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *see also Ferris v. State,* 355 Md. 356, 369, 735 A.2d 491 (1999) ("ordinarily . . . a [traffic] stop does not initially violate the federal Constitution if the police have probable cause to believe that the driver has committed a traffic violation"). In *Whren,* the Court concluded that the constitutional reasonableness of traffic stops did not depend on the actual motivations of the officers involved and that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."

*Whren,* 517 U.S. at 813, 116 S.Ct. 1769; *see also Pryor v. State,* 122 Md.App. 671, 679, 716 A.2d 338 (1998) ("Under *Whren,* the law enforcement officer who observes a traffic violation may stop the violator, even though the officer does so out of curiosity as to whether (or in the hope that) the stop will lead to the discovery of other incriminating evidence.") (citations omitted); *Whitehead v. State,* 116 Md.App. 497, 500, 698 A.2d 1115 (1997) ("In *Whren,* . . . the Supreme Court held that, as long as the police *could* have stopped the driver for a traffic violation, it is inconsequential that the police actually stopped the driver to investigate another offense.") (emphasis in original; citation omitted).

 Here, we proceed, *arguendo,* from the assumption that appellant was seized when McMillan tapped on the driver's side window and *told* appellant to roll down the window. Although the trial court found that McMillan *asked* appellant to lower the window, and defense counsel stated that the detective had "asked" appellant to lower the window, McMillan's testimony was unequivocal that he "told" appellant to roll down the window. The trial court found that the caretaking function applied and that reasonable articulable suspicion was present, but in our independent application of the law to the facts of this case, we conclude that McMillan's conduct amounted to a *Whren* stop. While we are satisfied that the record supports the suppression court's ruling, we are equally satisfied that the conduct of the officers can just as easily be justified as a *Whren* stop.

Our research has not revealed a Maryland case that has applied *Whren* in the context of a parking violation. Nonetheless, other jurisdictions have done so. *See Flores v. City of Palacios,* 381 F.3d 391, 402–03 (5th Cir.2004) (parking violation gave officer authority to conduct stop under *Whren* ); *United States v. Hughes,* 606 F.3d 311, 320 (6th Cir.2010) (recognizing that *Whren* applied where officer observed defendant violate parking laws, but remanding case to district court for determination of whether officer knew or reasonably believed that defendant was violating law by parking to obstruct

traffic); *United States v. Choudhry,* 461 F.3d 1097, 1101–4 (9th Cir.2006) ("parking violation alone provided the officers with a sufficient basis to conduct an investigatory stop of ... vehicle"; *Whren* applied because police officers were authorized to enforce civil parking violations); *Mitchell v. United States,* 746 A.2d 877, 886 (D.C.2000) (Parking violation gave officer authority to stop under *Whren.* "It is immaterial for Fourth Amendment purposes that the infraction in question was not a moving violation.").

In addition, in *Whren,* the Supreme Court declined to hold that only certain types of traffic violations could justify a stop while others might not. The Court wrote:

Petitioners urge as an extraordinary factor in this case that the "multitude of applicable traffic and equipment regulations" is so large and so difficult to obey perfectly that virtually everyone is guilty of violation, permitting the police to single out almost whomever they wish for a stop. But we are aware of no principle that would allow us to decide at what point a code of law becomes so expansive and so commonly violated that infraction itself can no longer be the ordinary measure of the lawfulness of enforcement. And even if we could identify such exorbitant codes, we do not know by what standard (or what right) we would decide, as petitioners would have us do, which particular provisions are sufficiently important to merit enforcement.

For the run-of-the-mine case, which this surely is, we think there is no realistic alternative to the traditional common-law rule that probable cause justifies a search and seizure.

*Whren,* 517 U.S. at 818–19, 116 S.Ct. 1769.

McMillan testified that he observed a violation of the vehicle laws because the Monte Carlo was parked more than twelve inches from the curb. *See* T.A. § 21–1004(a):

*Manner of parking generally.*—Except as otherwise provided in this section, a vehicle that is stopped or parked on a two-way roadway shall be stopped or parked parallel to the

right hand curb or edge of the roadway, with its right hand wheels within 12 inches of that curb or edge of the roadway.

The trial court credited that testimony concerning the position of the Monte Carlo in the street. Moreover, police officers are authorized to enforce all vehicle laws, including parking violations. *See* T.A. § 26–201(a)(1):

> *Authority of police officer to charge.*—A police officer may charge a person with a violation of any of the following, if the officer has probable cause to believe that the person has committed or is committing the violation: (1) The Maryland Vehicle Law, including any regulation adopted under any of its provisions. . . .

We find those authorities to be persuasive. We believe a parking violation to be at least the functional equivalent to the stop of a moving vehicle in violation of the motor vehicle laws. That, we conclude, comports with *Whren* and its progeny, and supports the denial of appellant's motion to suppress. We find no error.

## II. The Verdict Sheet

Appellant next asserts that the trial court erred in refusing to amend the verdict sheet, which provided in relevant part:

> Do you find that the defendant, ALTON HERRING, committed the following on or about August 19, 2008 in the 2700 block of W. Lanvale, Baltimore, Maryland:
>
> Count 1 Having been previously disqualified, did possess a regulated firearm, to wit: .32 caliber Revolver?
>
> Not Guilty _____ Guilty _____
>
> Count 4 Wear, carry, and transport a handgun, to wit: .32 Caliber Revolver upon and about his person?
>
> Not Guilty _____ Guilty _____

After the close of all the evidence, but before the trial court instructed the jury, defense counsel asked the court to amend the verdict sheet so that "it simply be numbered one and two. . . ." The trial court denied the request, stating: "No, it

has to be exactly the way it was in the charging document. The jury will not draw any negative inferences." [7]

Appellant claims that the trial court's failure to exercise its discretion to renumber the counts on the verdict sheet constituted reversible error. He contends that under the rationale of *Sherman v. State*, 288 Md. 636, 421 A.2d 80 (1980), the verdict sheet was prejudicial due to the likelihood that the jury would infer that there were at least two additional charges, *i.e.*, Counts 2 and 3. Appellant asserts that the trial court's comments make clear that it believed that it had no discretion to renumber the counts on the verdict sheet.

Appellant also contends that renumbering the verdict sheet to avoid any potential prejudice would have been consistent with Md. Rule 4–326(b), which provides that if the jury is permitted to take the charging document into the jury room, "[o]n request of a party or the court's own initiative, the charging documents shall reflect only those charges on which the jury is to deliberate."

Appellant claims that the court's error was prejudicial because the question of whether he possessed the gun "was hotly contested." He posits that the evidence demonstrated that he was never observed holding or touching the gun. He adds that there was no evidence concerning how long the gun had been in the car, who brought it into the car, and who put it into the console. Nor, he reminds, were any usable fingerprints recovered from the gun.

Appellant relies on *Sherman v. State, supra.* In that case, the trial court allowed the jury to take the five-count indictment into the jury room. *Sherman*, 288 Md. at 638, 421 A.2d 80. The indictment included, however, two counts as to which the court had granted Sherman's motion for judgment of acquittal. *Id.* The Court of Appeals held that under Rule

---

**7.** Appellant had been charged in a six-count indictment with three counts of possession of a regulated firearm after having been convicted of a disqualifying crime, one count of wearing, carrying, and transporting a handgun, and two counts of wearing, carrying and transporting a handgun after having been convicted of a felony.

758(a),[8] which was then in effect, no dead counts of a charging document were permitted to be before the jury during its deliberations. *Id.* at 642, 421 A.2d 80.

> In vacating Sherman's conviction, the Court commented:
> [I]t is difficult to perceive, in view of the secret character of jury deliberations, how it is possible to determine beyond a reasonable doubt that the dead counts played no part in the deliberations of the jury and its determination of guilt under the fifth count.

*Id.*

The State responds, by way of nothing more than speculation, that the jury most likely concluded that the numbers on the verdict sheet were the result of a clerical mistake because the trial court instructed the jury that on the verdict sheet, appellant "has two counts. . . ." In addition, the State points to defense counsel's closing, asking the jury "that on the two counts you find him [appellant] not guilty." According to the State, "[t]here is simply no reason to presume prejudice on the basis of the verdict sheet numbering."

The State also claims that *Sherman* is inapposite to appellant's case because the charging document provided to the jury in that case included counts upon which the trial court had already granted judgment of acquittal. The State asserts that, absent a rule on the formulation of verdict sheets, there could be no error, absent prejudice. And, the State concludes, the apparent misnumbering of the verdict sheet did not communicate to the jury the existence of additional offenses, much less their substance.

The State further contends that any error in this regard was harmless because the evidence against appellant was

---

**8.** Rule 758(a) provided:

> Upon retiring for deliberation, the jury may, with the approval of the court, take into the jury room all exhibits which have been admitted into evidence and *charging documents which reflect only the charges upon which the jury is to deliberate,* subject only to the safeguards imposed by the court for the preservation of the exhibits and the safety of the jurors. [Emphasis added.]

overwhelming. This is so, the State claims because: (1) McMillan and Himes testified that appellant was the owner of the Monte Carlo and that appellant was in the driver's seat; (2) after the windows were opened, both detectives immediately spotted the handgun resting in the center console between appellant and the front seat passenger; (3) a photograph of the handgun as it rested in the console was admitted into evidence; and (4) Himes testified that given the position of the gun's handle in relation to the driver's seat, appellant would have had "a slight advantage" in being able to pick the gun up quickly.

In sum, we conclude beyond a reasonable doubt that the numbering of the counts on the verdict sheet had no impact on appellant's trial. We agree with the State that *Sherman* offers appellant no relief.

*Sherman* was prejudiced because the jury learned that there were additional counts with which he had been charged and the crimes charged in those counts. In contrast, in the instant case it is not clear that the jury would have understood that there had been additional counts against appellant and it did not learn the crimes charged in those counts. Moreover, and particularly significant, the charging documents were not given to the jury, as was the case in *Sherman*.

In addition, Md. Rule 4–326(b), which is currently in effect, does not require the numbering that appellant sought at trial. The Rule provides:

(b) **Items taken to jury room.** Sworn jurors may take their notes with them when they retire for deliberation. Unless the court for good cause orders otherwise, *the jury may also take the charging document* and exhibits that have been admitted in evidence, except that a deposition may not be taken into the jury room without the agreement of all parties and the consent of the court. Electronically recorded instructions or oral instructions reduced to writing may be taken into the jury room only with the permission of the court. *On request of a party or on the court's own initiative, the charging documents shall reflect only those charges*

*on which the jury is to deliberate.* The court may impose safeguards for the preservation of the exhibits and the safety of the jury. [Emphasis added.]

Clearly, the Rule requires only that dead counts must be removed from the charging document. We decline to read into the Rule any requirement concerning the numbering of counts on the verdict sheet.

█ Further, we find nothing in the record to support a conclusion that appellant was prejudiced based on the way the counts were numbered on the verdict sheet. His claims of prejudice based on the numbering is speculative at best.

█ Finally, even if the trial court abused its discretion when it stated that the verdict sheet "has to be exactly the way it was in the charging document[,]" we hold that any abuse by the court was harmless beyond a reasonable doubt. *See Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976) (appellate court will not reverse the trial court unless appellant was harmed or prejudiced by that error). We base our conclusion on the substantial evidence of appellant's guilt. *See generally Brown v. State*, 364 Md. 37, 42, 770 A.2d 679 (2001) (any error in admission of gun and weapons examination was merely cumulative; collective effect of other evidence so outweighed prejudicial nature of the gun and weapons examination that there was "no reasonable possibility that the jury's verdict would have been different had the evidence been excluded"); *Rubin v. State*, 325 Md. 552, 578–80, 602 A.2d 677 (1992) (improperly admitted evidence constituted harmless error in light of overwhelming evidence of defendant's guilt); *Brooks v. State*, 299 Md. 146, 156, 472 A.2d 981 (1984) (error is harmless when " 'the cumulative effect of the properly admitted evidence so out-weighs the prejudicial nature of the evidence erroneously admitted that there is no reasonable possibility that the decision of the finder of fact would have been different had the tainted evidence been excluded' ") (quoting *Ross v. State*, 276 Md. 664, 674, 350 A.2d 680 (1976)) (emphasis omitted).

Detectives Himes and McMillan observed the "butt" of a handgun in the center console between appellant, who was the driver, and the front seat passenger, within easy reach of either. Appellant was the owner of the Monte Carlo. A photograph of the gun as it rested in the center console was admitted into evidence. We are unable to perceive any reasonable possibility that the jury would have acquitted appellant had the verdict sheet been numbered differently. *See Price v. State*, 111 Md.App. 487, 498–99, 681 A.2d 1206 (1996) ("In a possessory crime or one in which control or dominion over contraband . . . constitutes, or is an element of, the actus reus, the law engages in the legal fiction of constructive possession to impute inferentially criminal responsibility . . . ."; several factors are relevant to establishing that "nexus" such as "the proximity between the defendant and the contraband and the fact that the contraband was within the view . . . of the defendant"); *Handy v. State*, 175 Md.App. 538, 564, 570–71, 930 A.2d 1111 (2007) (applying factors in *Folk v. State*, 11 Md.App. 508, 518, 275 A.2d 184 (1971), "1) proximity between the defendant and the contraband, 2) the fact that the contraband was within the view or otherwise within the knowledge of the defendant, 3) ownership or some possessory right in the premises or the automobile in which the contraband is found, or 4) the presence of circumstances from which a reasonable inference could be drawn that the defendant was participating with others in the mutual use and enjoyment of the contraband" to determine that the evidence established that defendant had constructive possession of the contraband).

### III. Closing Argument

In closing argument, the prosecutor, on at least 15 occasions, told the jurors that the defendants constructively possessed the gun because they *could* have exercised dominion or control over it. Appellant suggests that those references that appellant and his co-defendants "could have" possessed the gun was an erroneous statement of the elements of constructive possession.

Appellant contends that the prosecutor's argument improperly informed the jury that he was guilty of possessing the gun if he merely *could* have exercised dominion and control over it. According to appellant, contrary to the definition of constructive possession, the prosecutor informed the jury that it was not necessary for the State to prove that he actually did exercise dominion and control over the gun.

Appellant concedes that he did not object to the prosecutor's improper comments, but asks this Court to address this question as plain error because: (1) the prosecutor's remarks clearly misled the jury; (2) the improper remarks were not isolated, but were pervasive throughout the prosecutor's arguments; (3) the question of his possession of the handgun was hotly disputed; and (4) the trial court took no curative action to mitigate the prejudicial impact of the improper comments.

The State asserts that we should decline to reach this question as plain error. The State adds that, in any event, the prosecutor's comments did not rise to the level of plain error because the prosecutor was attempting to: (1) disabuse the jury of any mistaken belief that actual possession was required, and (2) emphasize that constructive possession is predicated, in part, on the existence of the power to control.[9]

The State also argues that the prosecutor's comments did not mislead or unfairly influence the jury, and assigns three reasons for that conclusion: (1) the prosecutor mitigated any harm when she told the jurors to rely on the court's instructions for the definition of constructive possession; (2) the trial court instructed the jurors that arguments of counsel were not evidence; and (3) the evidence against appellant was "ponderous." Therefore, the State concludes, any alleged error did not affect the verdict.

---

**9.** The State also notes that in the closing argument made by counsel for one of appellant's co-defendant's, counsel framed the prosecutor's comments in the manner in which they were intended, *i.e.*, as an argument on the apparent ability or power component of constructive possession. In addition, in rebuttal, the prosecutor informed the jurors that they should look to the trial court's instruction for the meaning of constructive possession.

■■ "An appellate court ordinarily will not decide any issue not raised in and decided by the trial court. . . ." *Richmond v. State,* 330 Md. 223, 235, 623 A.2d 630 (1993), *overruled on other grounds, Christian v. State,* 405 Md. 306, 333, 951 A.2d 832 (2008); *see also Purohit v. State,* 99 Md.App. 566, 586, 638 A.2d 1206 (1994) (review of allegedly improper remarks not preserved where counsel failed to object to those remarks). Maryland Rule 8–131(a) controls the scope of appellate review and provides in relevant part:

> Ordinarily, the appellate court will not decide any [nonjurisdictional] issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal.

In *State v. Bell,* 334 Md. 178, 188, 638 A.2d 107 (1994), the Court of Appeals explained:

> It is clear from the plain language of Rule 8–131(a) that an appellate court's review of arguments not raised at the trial level is discretionary, not mandatory. The use of the word "ordinarily" clearly contemplates both those circumstances in which an appellate court will not review issues if they were not previously raised and those circumstances in which it will.

■■ "[T]his discretion should be exercised in favor of review when the 'unobjected to error [is] compelling, extraordinary, exceptional or fundamental to assure the defendant a fair trial.'" *Smith v. State,* 64 Md.App. 625, 632, 498 A.2d 284 (1985) (quoting *State v. Hutchinson,* 287 Md. 198, 203, 411 A.2d 1035 (1980)); *see also State v. Daughton,* 321 Md. 206, 211, 582 A.2d 521 (1990) (plain error is "error which vitally affects a defendant's right to a fair and impartial trial."); *Squire v. State,* 280 Md. 132, 134–35, 368 A.2d 1019 (1977) (appellate court, in its discretion and in the interests of justice, may decide a point argued by appellant for the first time on appeal); *Austin v. State,* 90 Md.App. 254, 268–72, 600 A.2d 1142 (1992) (in deciding whether to exercise our discretion,

this Court may consider the egregiousness of the error, the impact on the defendant, the degree of lawyerly diligence or dereliction, and whether the case could serve as a vehicle to illuminate the law.) Nevertheless, "[t]he touchstone remains, as it always has been, ultimate and unfettered discretion." *Austin*, 90 Md.App. at 268, 600 A.2d 1142.

As a general rule, "attorneys are afforded great leeway in presenting closing arguments to the jury." *Degren v. State*, 352 Md. 400, 429, 722 A.2d 887 (1999) (citations omitted). Counsel are permitted "to state and discuss the evidence and all reasonable and legitimate inferences which may be drawn from the facts in evidence; and such comment or argument is afforded wide range." *Wilhelm v. State*, 272 Md. 404, 412, 326 A.2d 707 (1974). " 'Summation provides counsel with an opportunity to creatively mesh the diverse facets of trial, meld the evidence presented with plausible theories, and expose the deficiencies in [opposing counsel's] argument.' " *Stevenson v. State*, 94 Md.App. 715, 729, 619 A.2d 155 (1993) (quoting *Henry v. State*, 324 Md. 204, 230, 596 A.2d 1024 (1991)).

In addition, "not every improper comment made during closing argument requires reversal." *Clarke v. State*, 97 Md.App. 425, 432, 630 A.2d 252 (1993) (citation omitted). Reversal " 'is only required where it appears that the remarks of the prosecutor actually misled the jury or were likely to have misled or influenced the jury to the prejudice of the accused.' " *Lawson v. State*, 389 Md. 570, 592, 886 A.2d 876 (2005); *see also Calloway v. State*, 141 Md.App. 114, 120, 784 A.2d 636 (2001) ("Even an improper remark does not necessarily compel reversal of a conviction unless the jury was actually misled or it was likely they were influenced to the prejudice of the defendant.") (citations omitted). "What exceeds the limits of permissible comment depends on the facts in each case." *Wilhelm*, 272 Md. at 415, 326 A.2d 707. "In determining whether reversible error occurred, we must take into account the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the

effects of the error, if any." *Wise v. State,* 132 Md.App. 127, 142, 751 A.2d 24 (2000) (citation omitted).

We cannot find in the record support for a conclusion that the prosecutor was intentionally trying to mislead the jury. That said, we are satisfied that the prosecutor muddied the trial court's clear instruction on constructive possession because the question before the jury was whether appellant exercised dominion and control over the handgun, and thus whether he possessed it, not whether he *could have* exercised dominion and control. *See State v. Leach,* 296 Md. 591, 596, 463 A.2d 872 (1983) (to support a conviction for a possessory offense, the " 'evidence must show directly or support a rational inference that the accused did in fact exercise some dominion or control over the prohibited ... [contraband] in the sense contemplated by the statute, *i.e.,* that [the accused] exercised some restraining or directing influence over it' ") (quoting *Garrison v. State,* 272 Md. 123, 142, 321 A.2d 767 (1974)). It is significant that the prosecutor was urging the jury to convict all four of the defendants, not just appellant. Her goal was to convince each juror that all four of the defendants, appellant included, had equal access to the gun.

For several reasons, we do not find plain error. First, the trial court correctly instructed the jury on possession:

> In determining whether somebody possesses a firearm, you may consider such factors as the location and proximity of the firearm[ ] and whether the firearm was in easy reach and available to the defendant. Possession means having control over the firearm, whether actual or indirect. A person not in actual intimate possession who knowingly has both the power and the intention to exercise control over the firearm, has indirect possession.

> In determining whether a defendant has indirect possession of a firearm, consider all of the surrounding circumstances. These circumstances include the distance between the defendant and the firearm. The common thread between the cases that talk about this say that the closer the more likely, the further away, the more less likely. Visibili-

ty versus hidden. The idea being if something is visible to somebody its more likely that they have control of it. If it's hidden, it's less likely, unless it turn out that they're the one who hid it.

Ownership or possessory interest in the vehicle and finally any other evidence of mutual use and enjoyment of the firearm by individuals. So ... those are factors that help you determine whether somebody is possessing....

Second, the trial court instructed the jury that the arguments of counsel were not evidence. Third, despite the frequent assertions by the prosecutor that the defendants *"could have exercised dominion and control"* over the handgun, appellant raised no objection. Fourth, this case does not serve as a vehicle to illuminate the law, for the law of possession is well-settled. Fifth, we are unable to conclude that the prosecutor's comments denied appellant a fair trial. As discussed in Section II., *supra*, the evidence against appellant was overwhelming.

This is not a case of outraged innocence. As Judge Moylan explained in *Morris v. State*, 153 Md.App. 480, 522–23, 837 A.2d 248 (2003):

The failure we so often see when the "plain error" exemption is invoked is the failure to realize the chasm of difference between due process and gratuitous process and the different mind sets that reviewing judges, in the exercise of their discretion, in all likelihood bring to bear on those two very different phenomena. We tried to explain this difference in *Jeffries v. State*, 113 Md.App. 322, 325–26, 688 A.2d 16 (1997).

When due process demands, the law will reverse the conviction of an undisputed and cold-blooded killer even on a technicality, *because it must.* A critical component of that principle, however, is the qualifying clause "because it must." It is not with any sense of satisfaction that a court reverses on a technicality. When it does so, it does so reluctantly and with heavy heart, and *only because it must.* The philosophical converse is that when

the procedural posture of an issue makes a reversal on a technicality a consequence that is not compelled but only gratuitously permitted, a court is frequently not motivated to be thus gratuitous.

There is a vast philosophical, as well as legal, distinction between due process and gratuitous process. There are procedural requirements that must be satisfied before *process* literally becomes *due.* For a reviewing court to overlook a precondition for review or to interpret loosely a procedural requirement, on the other hand, is an indulgence in favor of a defendant that is purely gratuitous. Even those who are indisputably factually guilty are entitled to due process. By contrast, only instances of truly outraged innocence call for the act of grace of extending gratuitous process. This appeal is not a case of outraged innocence qualifying for an act of grace. [Emphasis in original].

In sum, we find neither error nor abuse of discretion.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

