**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 08-4792**

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

v.

SHON MCHUGH,

Defendant - Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. James R. Spencer, Chief District Judge. (3:08-cr-00078-JRS-1)

Argued: September 23, 2009          Decided: November 4, 2009

Before MOTZ, Circuit Judge, HAMILTON, Senior Circuit Judge, and Irene M. KEELEY, United States District Judge for the Northern District of West Virginia, sitting by designation.

Vacated and remanded by unpublished per curiam opinion.

**ARGUED:** Richard Daniel Cooke, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellant. Paul Geoffrey Gill, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia, for Appellee. **ON BRIEF:** Dana J. Boente, Acting United States Attorney, Alexandria, Virginia, Olivia N. Hawkins, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellant. Michael S. Nachmanoff, Federal Public Defender, Alexandria, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

On January 30, 2008, Virginia State Police Trooper Michael Miller (Trooper Miller) stopped a vehicle driven by Shon McHugh (McHugh) on Interstate 95 in Greensville County, Virginia. During the stop, Trooper Miller asked for and received consent to search the vehicle. During the search, Trooper Miller discovered and seized crack cocaine, marijuana, and oxycodone. Following his indictment on charges of conspiracy to distribute five kilograms or more of crack cocaine and oxycodone, and possession with intent to distribute five kilograms or more of crack cocaine and oxycodone, McHugh moved to suppress the drugs seized during the stop, contending that Trooper Miller lacked reasonable suspicion to stop his vehicle. The district court initially denied McHugh's motion, but granted it upon reconsideration. The government appeals, and we vacate and remand for further proceedings.

I

The circumstances surrounding the stop are not in dispute. McHugh was driving a Ford Expedition (the Expedition) with Massachusetts license plates northbound on Interstate 95 when Trooper Miller, who was parked on the side of the interstate, observed that the Expedition's taillights had clear lenses on them, equipment he believed was unlawful under Virginia law.

Virginia Code § 46.2-1013 provides in relevant part:

> Every motor vehicle . . . shall carry at the rear two red lights plainly visible in clear weather from a distance of 500 feet to the rear of such vehicle. . . . Any such tail lights . . . shall be of a type approved by the Superintendent [of the Department of State Police of the Commonwealth of Virginia].

Va. Code Ann. § 46.2-1013.[1]  Trooper Miller testified that, through his training, he knows that anything that comes stock on vehicles fits within the parameters of the State Inspection Manual and the Virginia Code.  According to Trooper Miller, the purpose of his stop of the Expedition was "[t]o investigate the fact that the taillights . . . appeared to be unauthorized equipment by Commonwealth of Virginia law and I needed to check and make sure that they were in fact approved equipment."  (J.A. 14).  Trooper Miller suspected the taillights on the Expedition were unlawful because: (1) he knew 1997 Ford Expeditions came

---

[1]  In 19 Virginia Administrative Code § 30-70-150, the Superintendent set forth, in regulatory form, the standards governing the inspection of vehicles in Virginia with respect to "Rear lamps:tail lamp; license plate lamps and rear lamp combinations."  Id.  Such regulation directs that the inspector:

> Inspect for and reject if:
>
> 1. Vehicle is not equipped with a rear (tail lamp) or rear lamp combination of an approved type or light assembly does not work as designed by the manufacturer.  The approval designation letters that must appear are DOT or SAE-A-I-S-T-P for single lamps, DOT or SAE-A-I-S-T-P-R with a backup light, DOT or SAE-A-I-S-T-P-P2-R with a wrap around side-marker lamp and backup light.

Id. at § 30-70-150(1).

- 4 -

stock with red-lensed taillights; (2) he clearly observed that the Expedition had after-market, clear-lensed taillights; (3) in his experience, he had encountered non-approved, after-market taillights "[m]any, many, times"; and (4) he had written "many, many tickets for unapproved taillight covers that weren't . . . approved." (J.A. 35).

Before initiating the stop, Trooper Miller confirmed with another Virginia State Trooper that the clear lenses on the Expedition's taillights probably did not comply with Virginia law. After receiving this confirmation, Trooper Miller stopped the Expedition. As Trooper Miller executed the stop, he observed that the Expedition's taillights emitted red light.

After the stop, Trooper Miller inspected the Expedition's taillights. He noticed the lenses on the Expedition's taillights were clear, but that the taillights' bulbs and reflectors were red. He also noticed that the taillights were stamped with markings indicating they may have been of a type approved by the Superintendent.

Upon noticing only one key on McHugh's key chain and the presence of air fresheners and a CB radio in the vehicle, circumstances he believed were indicative of drug trafficking, Trooper Miller asked for and received consent to search the vehicle. During the search, Trooper Miller discovered and

- 5 -

seized approximately six kilograms of crack cocaine, one-half pound of marijuana, and approximately 100 oxycodone pills.

On February 20, 2008, a federal grand jury sitting in the Eastern District of Virginia returned a two-count indictment against McHugh. In Count One, McHugh was charged with conspiracy to distribute five kilograms or more of crack cocaine and oxycodone, 21 U.S.C. § 846. Count Two charged McHugh with possession with intent to distribute five kilograms or more of crack cocaine and oxycodone, 21 U.S.C. § 841.

McHugh moved to suppress the evidence seized from the Expedition, contending that there was no reasonable suspicion to support the stop. In response, the government posited that the stop was justified, principally because Trooper Miller had reasonable suspicion to believe that the clear lenses on the taillights violated § 46.2-1013, because they were: (1) clear and (2) not of a type approved by the Superintendent. Initially, the district court denied the motion. However, upon McHugh's motion for reconsideration, the district court granted the motion.

The district court began its analysis by noting that a suspicion "based on a mistaken belief does not make the suspicion (or the stop that it motivated) unreasonable, provided that the error was a reasonable mistake of fact." (J.A. 83). In contrast to a mistake of fact, the district court next

- 6 -

observed that "a mistake of law cannot justify a stop, even if the mistake was reasonable." (J.A. 83). Turning to the issue of whether the case involved a mistake of fact or a mistake of law, the district court concluded that it was one of law because, while Trooper Miller correctly perceived that the taillights on the Expedition had clear lenses, he incorrectly believed that such clear lenses violated Virginia law, as "section 46.2-1013 does not prohibit motor vehicles from being equipped with taillights whose lenses are clear." (J.A. 94). In view of this perceived mistake of law, the district court concluded that Trooper Miller did not have an articulable, reasonable suspicion that the Expedition, as configured, violated Virginia law.

II

This court reviews the district court's factual findings underlying a motion to suppress for clear error, and the district court's legal determinations de novo. United States v. Grossman, 400 F.3d 212, 216 (4th Cir. 2005). The decisive issue in this case is whether the stop of the Expedition was supported by reasonable suspicion under the Fourth Amendment. The validity of McHugh's consent is not at issue.

The Fourth Amendment protects citizens from unreasonable searches and seizures by the government, and its protections

extend to brief investigatory stops that fall short of traditional arrest. United States v. Arvizu, 534 U.S. 266, 273 (2002). In the context of investigatory detentions, the Supreme Court has held that, consistent with the Fourth Amendment, a police officer may conduct an investigatory stop if the officer has a reasonable suspicion that criminal activity may be afoot. Terry v. Ohio, 392 U.S. 1, 31 (1968). Such an investigatory stop must be based on "at least a minimal level of objective justification" but the standard for reasonable suspicion is less demanding than for probable cause. Illinois v. Wardlow, 528 U.S. 119, 123 (2000).

In assessing whether an officer had a reasonable suspicion of criminal activity, this court must consider the totality of the circumstances surrounding the seizure. United States v. Sprinkle, 106 F.3d 613, 618 (4th Cir. 1997). "Reasonable suspicion is a commonsensical proposition. Courts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the streets." United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993).

To establish reasonable articulable suspicion, an officer must be able to articulate something more than an inchoate and unparticularized suspicion or hunch. United States v. Sokolow, 490 U.S. 1, 7 (1989). However, reasonable articulable suspicion may be established by a series of acts, each of them perhaps

innocent when viewed separately, but when viewed in the aggregate by a trained police officer warrant further investigation. Id. at 9-10. In assessing whether reasonable suspicion existed, the facts, whether seemingly innocent or obviously incriminating, are to "be assessed in light of their effect on the respective officer's perception of the situation at hand." United States v. McCoy, 513 F.3d 405, 414 (4th Cir. 2008). Even when each fact alone may be susceptible of an innocent explanation, "the question is whether taken together, they are sufficient to form a particularized and objective basis for an officer's suspicions." United States v. Black, 525 F.3d 359, 365-66 (4th Cir. 2008) (internal quotation marks and alteration omitted).

Under the totality of the circumstances in this case, Trooper Miller had an articulable, reasonable suspicion that the Expedition, as configured, violated Virginia law. Trooper Miller stopped the Expedition because he reasonably believed the after-market, clear-lensed taillights may not have been of a type approved by the Superintendent. This reasonable belief was based on the following objective facts: (1) the lenses on the taillights were clear; (2) Trooper Miller knew 1997 Expeditions came stock with red-lensed taillights; (3) Trooper Miller had encountered non-approved, after-market taillights "[m]any, many, times"; and (4) Trooper Miller had written "many, many tickets

for unapproved taillight covers that weren't . . . approved."
(J.A. 35). Because Trooper Miller pointed to specific and
articulable facts which, taken together with rational inferences
from those facts, evince more than an inchoate and
unparticularized suspicion or hunch of criminal activity (i.e.,
a violation of § 46.2-1013), the Fourth Amendment's reasonable
suspicion requirement for a brief investigatory stop under Terry
was satisfied in this case.[2]

The flaw in the district court's analysis is evident. It
concluded that a mistake of law was present because § 46.2-1013
does not prohibit clear lenses on taillights.[3] While it is true

_____

[2] Although McHugh acknowledges that the Expedition, despite
being registered out of state, was subject to § 46.2-1013, he
argues that the statute is not enforceable against him because
it does not have a corresponding implementing regulation.
According to McHugh, 19 Virginia Administrative Code § 30-70-
150, which specifies the Superintendent's taillight requirements
(including that approved taillights must have certain approval
markings), does not operate as the standard by which taillights
on every vehicle in Virginia are to be measured for compliance
with § 46.2-1013. We reject this argument for the simple reason
that § 46.2-1013 specifies that every motor vehicle must have
taillights of a type approved by the Superintendent. Moreover,
the fact that the standards set forth by the Superintendent in
§ 30-70-150 supply the standards to be applied by designated
state vehicle inspectors does not prevent them from serving as
the standards for the types of taillights approved by the
Superintendent. Indeed, § 30-70-150 clearly sets forth the
types of taillights approved by the Superintendent.

[3] For purposes of our discussion, we assume, without
deciding, that an officer's reasonable mistake of law may not
provide the objective grounds for reasonable suspicion to
justify a traffic stop.

that § 46.2-1013 does not in explicit terms prohibit clear lenses on taillights, the district court's analysis overlooks a critical component of § 46.2-1013--that the taillights "shall be of a type approved by the Superintendent." Here, Trooper Miller had an articulable, reasonable suspicion to believe that the clear lenses on the Expedition's taillights were <u>not</u> of a type approved by the Superintendent. While he may have been mistaken in believing that the clear lenses on the taillights were not of a type approved by the Superintendent, he clearly was not mistaken in his belief that Virginia law required the clear lenses to be of a type so approved. Thus, any mistake on the part of Trooper Miller involved one of fact, not law. Put another way, under the <u>facts</u> before him, it was reasonable for Trooper Miller to believe that a § 46.2-1013 traffic violation may have been committed and, therefore, the stop was objectively reasonable.[4]

---

[4] At oral argument, McHugh heavily relied on our <u>en banc</u> decision in <u>United States v. Wilson</u>, 205 F.3d 720 (4th Cir. 2000) (<u>en banc</u>). In <u>Wilson</u>, the defendant was pulled over solely because the officer could not read the handwritten expiration date on the vehicle's temporary license tag. <u>Id.</u> at 723-24. We concluded that an "objective assessment of the facts and circumstances of this stop compels the conclusion that the officer lacked any articulable, reasonable suspicion that a violation had occurred." <u>Id.</u> at 724. In so concluding, we noted that the officer "saw nothing wrong, and he suspected nothing." <u>Id.</u> In contrast to <u>Wilson</u>, objective facts were before Trooper Miller in this case that gave rise to a reasonable suspicion that a violation of § 46.2-1013 had (Continued)

III

For the reasons stated herein, the judgment of the district court is vacated and the case is remanded for further proceedings.[5]

VACATED AND REMANDED

---

occurred.  For this reason, McHugh's reliance on <u>Wilson</u> is misplaced.

[5] In view of our conclusion that reasonable suspicion justified Trooper Miller's stop of the Expedition, we need not consider the government's alternative argument that the stop was justified under the good faith exception to the exclusionary rule.  In addition, on August 20, 2009, the government filed a motion to expedite oral argument.  We dismiss this motion as moot.